Argued September 25, 1957, disbarred May 14, petition for
rehearing denied July 9, 1958

IN RE COMPLAINT AS TO THE CONDUCT OF
## GEORGE C. REINMILLER
325 P. 2d 773

681

*Joseph O. Stearns* and *Henry L. Hess*, Portland, argued the cause and filed briefs for accused.

*William D. Campbell* and *Robert L. Myers*, Portland, argued the cause and filed a brief for Oregon State Bar.

PER CURIAM.

This matter is on petition of George C. Reinmiller for a review of the recommendation of the Board of

Governors of the Oregon State Bar that he be permanently disbarred from the practice of law in this state.

It originates from two separate complaints of the State Bar, denominated, respectively, Case 538 and Case 597. After two separate hearings before two different Trial Committees appointed by the bar, each committee separately recommended to the Board of Governors that the defendant be suspended. The Board of Governors, after a review of the findings and recommendations of each Trial Committee, consolidated its findings and conclusions and recommended to this court the action which occasions this review.

The defendant was represented by able counsel and had fair trials with every opportunity to get into the record everything most favorable to him. The two hearings resulted in a voluminous record for our consideration, consisting of a transcript of testimony of 603 pages in Case 538 and of 311 pages in Case 597. It also includes 152 exhibits in both cases.

We first give attention to the charges of unprofessional conduct made in

## CASE 538

The overall charge found in paragraph III of the complaint is: that for five years past the conduct of the defendant has been such that if Mr. Reinmiller were presently applying for admission to the Bar of the state of Oregon, his application would be denied. ORS 9.470. This, in turn, is supported in the complaint by ten separate allegations of misconduct growing out of attorney-client relationships with eight different clients. Paragraph X is in the nature of an additional charge springing from the defendant's services to Baker and likewise paragraph XI as to services to Hodson and so, too, paragraph XIV as

to the defendant's relationship with his client Marie L. Johnson.

In Case 538 many of the charges of misconduct follow the same general pattern and are, in many instances, common to the conduct of defendant in serving or failing to serve two or more of his clients. All charges in the first instance were brought to the attention of the State Bar by the clients of defendant who felt aggrieved by Mr. Reinmiller's treatment of the matters entrusted to him. The defendant's defenses and excuses are likewise much the same in every instance.

Because some of the charges in Case 597 involve withholding funds, we say, in justice to the defendant, that we find no charge suggesting nor any evidence warranting a conclusion that the funds withheld involved any embezzlement or conversion of any kind on the part of the defendant, except as to the funds referred to in Case 597. Moreover, as far as we are apprised, all clients' moneys received by him were deposited to a separate and special account and not commingled with his own. "Withholding of funds" as employed in the complaint and used by us connotes an apparent, unjustifiable and unreasonable delay long after it was defendant's duty to disburse them to those entitled thereto.

In examining the several charges against Mr. Reinmiller, we will review them in terms of each separate client relationship.

### The Marie L. Johnson Matter

On or about September 27, 1949, the defendant was retained by Mrs. Marie L. Johnson to represent her in a divorce suit then pending in Multnomah county, wherein her husband, Joe H. Johnson, was plaintiff. At the time the business was tendered he received funds

to apply on costs and retainer and shortly thereafter, $100 more. Mrs. Johnson was living in the state of Nebraska when served with summons. She initially dealt with Richard E. Person, of the firm of Person & Wilson, attorneys, practicing in Holdrege, Nebraska. Mr. Person promptly forwarded the complaint to the defendant, soliciting his services in Mrs. Johnson's behalf. Mr. Reinmiller never met Mrs. Johnson nor was she in the state of Oregon during the period while the divorce matter was pending. Except for one letter directly to Mrs. Johnson in 1952 and two letters in 1953, his communications were all with Mr. Person, with occasional copies enclosed for Mrs. Johnson. After the filing of the documents and papers hereinafter referred to, the matter was eventually set for trial on June 25, 1954, a little short of five years after it was placed in the defendant's hands for attention. At the uncontested hearing on that date, the court raised the question of jurisdiction and, in the absence of proof, continued the matter until Mr. Reinmiller could supply testimony supporting the allegation that Mr. Johnson had resided in Oregon for the statutory period. This was never done and so far as the record before us is concerned, the cause continues awaiting the required evidence of residence.

Out of his professional relationship grow the following charges of the Bar Association:

(1) That during the period from 1950 to April, 1954, the defendant neglected to answer communications from his client or keep her advised of the progress of the litigation;

(2) That he failed to prosecute the litigation with diligence;

(3) That he failed and neglected to answer communications from the State Bar and its

Grievance Committee concerning the matter; and

(4) That when he accepted the employment he knew that Mrs. Johnson's husband had not resided in the state for a sufficient period of time, namely, the one year necessary to give the court jurisdiction; that he failed to advise Mrs. Johnson or take any steps to bring this want of jurisdiction to the attention of the court, but proceeded, contrary to this knowledge, and set the case for trial.

The defendant's answer admits the employment and the final disposition of the case as alleged, that is, he set the matter for hearing on June 25, 1954, after a delay of four years and nine months. He denies failure to answer communications, claiming as to those from the Oregon State Bar or its committee, that "he has no memory or recollection" concerning them. As to the jurisdictional matter, he asserts that he at no time knew that Joe H. Johnson, plaintiff in the divorce case, was not a bona fide resident of Oregon as he alleged in the divorce complaint; that he accepted such allegations as true and relied and acted on such belief. He also says he: "at no time and under no circumstances did [he] attempt or intend to mislead or impose upon the court" in the divorce matter.

The charge in the Marie L. Johnson matter relating to defendant's knowledge of the court's want of jurisdiction because of the insufficiency of the residence of the plaintiff, Joe H. Johnson, in the divorce suit being as it is, the most serious one in this particular matter, we give it first notice.

■ The defendant in his brief asserts that there is: "* * * no evidence in the record that Johnson was not a resident of Oregon for a year prior to filing the

Complaint * * *." If defendant refers only to the circuit court record, he is correct. If, however, defendant is referring to the record made at the hearing before the Trial Committee, then we must disagree. We are here interested, primarily, in *what Reinmiller knew* about Johnson's residential qualifications and not what the court record may show. The charge made by the Bar goes to defendant's conduct in suppressing the information he had and comporting himself in the divorce matter as if such information was nonexistent.

His knowledge has its origin in Mr. Person's first communication to Mr. Reinmiller. In his letter of September 21, 1949, transmitting the copy of complaint in the divorce suit served on Mrs. Johnson, Mr. Person, after observing that there are several statements in the complaint which are not correct, proceeds to point them out, including the following positive statement with reference to Mr. Johnson's allegation of residence in this state, saying:

"Also, he alleges [referring to the complaint] that he has been a resident of Oregon for more than one year which is not correct. Mr. and Mrs. Johnson lived in Phelps County, Nebraska, until late in 1948, at which time they moved to Denver, Colorado, and did not go to Oregon until January of 1949. Furthermore, in March of 1949 they moved to Vancouver, Washington, and lived there for a month."

Mr. Person then suggests delay for the following reason:

"Mrs. Johnson is pregnant at this time and their third child is to be born on or about November 1, 1949, and we feel that the divorce hearing should not proceed until after the birth of this child to see whether or not the child lives and so that an allowance can be made for this third child."

Again, we find Person's consciousness of the residential insufficiency when he tells Mr. Reinmiller:

"Mrs. Johnson does not care to object to the divorce as she realizes that it would not work for them to go back and live together as husband and wife so we don't care to raise this jurisdictional requirement as to the one year unless that is the only means that you can get his attorney to hold off hearing until after the birth of their third child."

But preceding that statement is his pointed confession that "I am not familiar with Oregon practice," thus leaving the ultimate procedural considerations solely to Mr. Reinmiller's judgment. This statement of Mr. Person's attains more significance when we later examine his letter of July 6, 1953, which Mr. Reinmiller relies upon heavily for exoneration on the jurisdictional question.

Mr. Reinmiller made prompt acknowledgment on September 27, 1949, in which he says: "I appreciate your statement on the residence matter *and you are correct in that.*" Later, in the same letter, he gives weight to the conclusion by saying: "* * * he hasn't been a resident of this State long enough and is attempting *to obtain a divorce through fraud.*" (Emphasis ours.)

He goes on to suggest to Mr. Person in the letter of September twenty-seventh the procedures to be followed and the amounts to be sought for support and attorneys' fees pendente lite, saying he will shortly prepare and send papers for Mrs. Johnson's signature. This he did. We find that Mrs. Johnson, on the eighth of December, 1949, executed the affidavit to support her motion for monetary aid, as prepared by Reinmiller, and that a copy thereof attached to the motion for a show-cause order was served on Mr. Edwin Lewis, the attorney representing her husband, Joe H. Johnson.

Although substantial portions of the record in the Johnson divorce case were separately introduced, there is nothing before us indicating that the entire record was put in evidence. No part of it includes the motion for an order to show cause nor any order based thereon. However, Reinmiller, in response to a query from a member of the Trial Committee as to whether or not an attempt had been made to secure such an order, replied: "Yes, there was an order and we attempted personal service, but we were unable to get him to be served personally, that is, referring to the plaintiff [Joe H. Johnson], and service was had upon his attorney."

Thus we find Reinmiller seeking for his client the pendente lite relief provided by ORS 107.090, notwithstanding that at the time of the application he well knew neither plaintiff nor defendant had resided in this state for a year preceding the filing of the complaint in the Johnson case.

The fact that he was unsuccessful in locating the plaintiff Johnson for service of the order does not, in our opinion, exonerate Mr. Reinmiller from trifling with the court in order to attain ends apparently not in the contemplation of the statute. That he had then no expectation of challenging the jurisdiction of the court, as he was then amply fortified to do, finds confirmation in the fact that on June 22, 1951, he filed Mrs. Johnson's answer and cross-complaint as prepared and signed by him and verified by Mrs. Johnson in Nebraska on May 28, 1951.

The answer so filed in behalf of Mrs. Johnson admits as true the allegation of her husband's complaint respecting the term of his residence in Oregon prior to the filing of his complaint.

There is nothing in the record up to that time that justified Mr. Reinmiller in believing that the statements above quoted from Mr. Person's letter of September 27, 1949, concerning the plaintiff's alleged residence in Oregon were untrue or that Mrs. Johnson had repudiated all or any part of them.

Apparently, the defendant was then prepared to hope he could avoid the jurisdictional question by Mrs. Johnson's admission unless raised by the court on its own motion. If he could, by silence, hurdle that matter, he was prepared to seek a decree of divorce for his client, as indicated by her cross-complaint and the hearing had on June 25, 1954.

If he entertained any doubt about the truth of the residential history of the plaintiff, as disclosed by the representations in the first letter he received, then, rather than accept as true Mr. Johnson's allegation of residential qualification merely because Johnson verified his complaint under oath, it was Reinmiller's clear duty to inquire and satisfy himself whether or not Mrs. Johnson was prepared to furnish proof which would overcome the force of her husband's allegation; or, if still in doubt, to answer with a plea in abatement, thereby forcing the issue for judicial determination; or to decline to serve Mrs. Johnson if success in doing so would require withholding facts which, if known to the court, would defeat its right to jurisdiction or if later learned might impair the validity of its divorce decree. Moreover, eager as Mrs. Johnson may have been for a divorce, she was entitled to know the possible and dangerous consequences of seeking a divorce in a court obviously without power to grant it if the suppressed truth came to light. We perceive that an honest disclosure to her certainly would have avoided the delays now complained of and placed her in a posi-

tion where she might have long before obtained a divorce in the state of her residence.

Very shortly after the filing of Mrs. Johnson's answer and cross-complaint, Mr. Reinmiller prepared, pursuant to stipulation, a deposition for Mrs. Johnson based on interrogatories covering her testimony in support of her cross-complaint. This was apparently done to save her the expense of coming to Oregon when the suit was set for trial. We note that it included no questions concerning her knowledge of Mr. Johnson's residence. The absence of a question intended to develop that point indicates to us that Mr. Reinmiller still had faith in what Mr. Person reported to him in his letter of September 27, 1949, and did not want to disclose it to the court, hoping that by admitting the allegation of residence found in the complaint the court might overlook the issue and grant his client a decree.

The interrogatories prepared by the defendant or someone in his office, acting under his direction, were sent to Mr. Person on July 10, 1951, for Mrs. Johnson's attention. The deposition was executed and returned directly by her or someone in her behalf to the clerk of the court but without notice to Mr. Reinmiller. It was filed by the clerk on November 2, 1951. But the matter of her divorce remained quiescent so far as Mr. Reinmiller was concerned from July 10, 1951, until June 23, 1954. On the latter date Mr. Reinmiller made inquiry for the first time concerning the whereabouts of the deposition. It was then he discovered its presence in the court files; whereupon he had the suit set for hearing on June 25, 1954. Mr. Reinmiller's excuse for this long lapse of interest will later be referred to.

On that day, the plaintiff defaulting, the court proceeded to hear the testimony in behalf of Mrs. Johnson on her cross-complaint. This consisted solely of her

deposition. After its presentation, the court on its own motion asked: "How about the jurisdiction question"? to which Mr. Reinmiller replied: "Your Honor, I know of that * * * I know that he [the plaintiff husband] lived here in Eastern Oregon, and that he has been out of the State since that time, *but he did live here for a year and did have residence here at that time. * * *"* (Emphasis ours.) The judge then indicated that if Mr. Reinmiller would supply evidence of plaintiff's year of residence before filing his complaint in 1949, the court would hold the matter open to give him the opportunity.

On June 28, 1954, Mr. Reinmiller reported to Mr. Person that a hearing had been had on June twenty-fifth, adding: "I have everything in order for the decree to be granted, *except for testimony regarding the jurisdiction of our court.* This matter should be handled by a further deposition of Mrs. Johnson *to the effect that Mr. Johnson was a resident of Oregon for more than one year prior to the filing of his divorce complaint.*" (Emphasis ours.) He further suggests that Mr. Person prepare the supplemental deposition and says that unless she does so the decree would not be granted.

This advice in the light of the information which Mr. Reinmiller had up to that time concerning Mr. Johnson's want of residental qualifications, was tantamount to an invitation to Mrs. Johnson under the guidance of Mr. Person to commit perjury in order to obtain a divorce.

It is very evident that Mr. Person and Mrs. Johnson refused to be parties to such an enterprise, for the supplemental deposition drawn in Nebraska makes no reference to Mr. Johnson's residence in Oregon, as requested by Mr. Reinmiller, but, to the contrary,

speaks only of her residence as being in "the State of Nebraska prior to and since September of 1949." This was sworn to on August 11, 1954, and filed in the divorce matter on August twentieth of that year. Nothing has transpired in the divorce suit since.

We now turn to the defense tendered by the defendant in justification for this course of conduct respecting the jurisdictional question in the divorce case. He places his greatest reliance upon Mr. Person's letter of July 6, 1953. He points to a sentence therein, reading: "It would seem that there is no reason why you couldn't go ahead out there and get the divorce since the case is at issue and the Court has jurisdiction." He represents that this was an assurance to him that Johnson had been, in fact, a resident of Oregon for the required time.

He also claims like assurance from Mr. Lewis as Johnson's attorney. But Mr. Lewis, called as a witness for defendant, claims he had no information on the subject beyond his client's statement that he had lived here a year before filing his complaint and that he knew nothing about the man until he had solicited his services in the divorce matter. Moreover, and more important, we think, is Mr. Lewis' testimony that the first time Mr. Reinmiller discussed the question of Mr. Johnson's residence with him was "After the hearing, after the hearing on the deposition in court." This would mean sometime after June 25, 1954, and when Reinmiller was apparently looking for someone who could support his then dangling case.

We are of the opinion that his reliance on the Person letter of July 6, 1953, is a mere pretense and afterthought conjured up after this charge was made against him by the Bar for the reasons which follow:

(1) The letter of that date is one revealing both Person's and Mrs. Johnson's impatience with the defendant's delay, then a matter of nearly four years and was designed to induce action; (2) Person at the very beginning of his relationship with Mr. Reinmiller, as we have earlier pointed out, indicated "I am not familiar with Oregon practice" and his entire correspondence with defendant subsequent thereto indicates that he was continually relying entirely upon Mr. Reinmiller's knowledge of Oregon law and practice; (3) Person had a right to assume from Reinmiller's activities in the case prior to July 6, 1953, by reason of the motion to show cause and the preparation of the answer and cross-complaint for Mrs. Johnson, that Johnson's claim of residence was correct as the result of new facts accumulated in Oregon by Mr. Reinmiller. He also had a right to assume that Reinmiller had changed his viewpoint as to the controlling law in Oregon on the jurisdictional question; and (4) We note, too, that Mr. Reinmiller after receiving Mr. Person's reference to the "court having jurisdiction," made no inquiry of Mr. Person to ascertain what new evidence, if any, Mr. Person had which would warrant the reference to jurisdiction as made by him.

To take a Nebraska attorney's statement on jurisdiction in Oregon as a correct exposition of the Oregon law, knowing, as Reinmiller did, that the Nebraska attorney had disclaimed any knowledge of Oregon practice, and to accept it without further inquiry is too ridiculous and absurd to persuade this court to accept his claim of Mr. Person's "assurance" as an exoneration of his conduct thereafter.

An attorney is an officer of the court (ORS 9.010). His duties as such are found in ORS 9.460 where,

among other things, it is provided in subsection (3) that he shall:

"Counsel or maintain such actions, suits, or proceedings or defenses only as may appear to him legal and just, except the defense of a person charged with a public offense."

And subsection (4) reads that he also shall:

"Employ, for the purpose of maintaining the causes confided to him, such means only as are consistent with truth, and never seek to mislead the court or jury by any artifice or false statement of law or fact."

Both of the foregoing subsections are embodied in the prevailing Rules of Professional Conduct, as adopted by the Oregon State Bar in 1935 and approved by this court the same year (See § 27, sub (3) and (4)). Wilful violations of any provision of ORS 9.460, supra, are made grounds for disbarment or suspension of attorneys by ORS 9.480(4).

■ We are of the opinion that in the matter of the jurisdictional question raised in the divorce suit, the defendant has not only violated his obligation to his client Mrs. Johnson, his correspondent counsel Mr. Person, of Nebraska, and the courts of this state, but in so doing has transgressed his duty as an attorney and officer of the court as laid down in subsections (3) and (4) of ORS 9.460, supra.

The defendant's primary excuse for want of diligence in the prosecution of the litigation in the Johnson divorce matter is that he expected to be notified when Mrs. Johnson had executed the interrogatories, which he had prepared and which were sent to her in July, 1951, and which were, in November, 1951, sent to the clerk of the court, but through inadvertence of Mrs. Johnson or Mr. Person, without direct notification to Mr. Reinmiller. He did not think to make any

inquiry of the clerk until June 23, 1954, a lapse of nearly three years after the defendant had mailed them to Mr. Person. Meantime, he lacked interest or diligence sufficient to cause him to make inquiry of the Nebraska attorney or his client concerning the whereabouts of the deposition. This he did by letter to Person dated June 23, 1954. This, by strange coincidence was the very day he discovered Mrs. Johnson's deposition reposing in the court files. Had his interest in her affairs been what it should have been, the hearing had in June, 1954, might have been had in 1951.

During the period from 1950 to April, 1954, we find that he addressed only four letters to Mr. Person; of the two in 1951, one enclosed the answer and cross-complaint for Mrs. Johnson's signature and one in July of that year the deposition previously referred to. In 1953, according to the record, Mr. Person had but one letter from Mr. Reinmiller. This advised him that Reinmiller had written to Mrs. Johnson in response to Mr. Person's request of August 8, 1953, that he do so and tell her the status of the case. This we assume is his letter to Mrs. Johnson, dated August twenty-third. We find no more letters to Person from that date until June 23, 1954, which was his belated inquiry concerning the Johnson deposition which he found the same day at the courthouse.

As to Mrs. Johnson, he wrote her but three letters in the same period; one on September 2, 1952. This only to tell her he had been out of his office about a month "on business" and "more recently on a minor leg injury." He adds "that I will check with the court tomorrow and if everything is in order will take default immediately." He added that he would write after checking with the court.

We find nothing disclosing that he ever wrote to

Mrs. Johnson again until August 11, 1953, when he explains his delay in answering her letter of July 6, 1953, was because he had been in Nebraska attending the burial of his mother, but nothing explaining the status of the case. His next and last letter to Mrs. Johnson was that of August 21, 1953. He informed her that he had written to her a week before (very possibly referring to his letter of August eleventh, above mentioned) but giving her nothing more than that he "expected to be in the East a few days on business, and will return to the office shortly, and will conclude your business."

The three letters to Mrs. Johnson above referred to, as well as several to Mr. Person, were in response to their indicating impatience with Mr. Reinmiller's delays and requesting information as to when the matter could be concluded. We note that none of them carries any inquiry from Mr. Reinmiller, except his letter to Person, of June 23, 1954, concerning the status of the interrogatories which he mailed in 1951.

We think the evidence justifies the conclusion that the defendant neglected to answer, at least in terms of the inquiries made, the communications received either from Mrs. Johnson or Mr. Person during the period from 1950 to April, 1954, or keep them sufficiently advised of the progress of the litigation.

Inasmuch as during the course of the trial the State Bar abandoned their charge respecting Reinmiller's failure and neglect to reply to communications from the Bar and Grievance Committee, no comment on that charge is necessary.

### The John Q. Johnson Estate Matter

John Q. Johnson died testate in 1943. Sometime in 1944, Isabel Belk Creek, a daughter of the decedent,

and other heirs, retained Mr. Reinmiller to represent them in the estate proceedings. A decree determining heirship was entered in 1948. Mrs. Creek died in 1951, leaving as her sole heir, her daughter, Nettie Creek Wells, a resident of Missouri. At Mr. Reinmiller's solicitation she became his client. Notwithstanding the previous orders referred to, an order of final distribution was not entered in the Johnson estate until June 2, 1952. This order revealed that $611.78 was the share of Isabel Belk Creek. Prior to that time no charge is made that Mr. Reinmiller was in any way responsible for undue delays, if any, between the date of Mr. Johnson's death and the entry of the final order.

On June 7, 1952, the attorneys for the estate by letter advised Mr. Reinmiller that the Creek share was held until a probate of Mrs. Creek's estate could be had and that if application for payment was not made within three months the money would be paid over to the County Treasurer pursuant to ORS 117.310.

No action having been taken by Mr. Reinmiller in the meantime, on November 13, 1952, the attorneys for the executor advised him that Mrs. Creek's share had been paid to the County Treasurer. After a lapse of one year, the money was, in turn, remitted to the State Land Board with the result that Mrs. Wells, as heir of Mrs. Creek, was confronted with a new delay and additional expense to recover this sum as provided by ORS 120.130.

The Bar complaint charges: (1) that at no time since the death of Mrs. Creek in 1951 nor since the order of distribution of June 2, 1952, has the defendant taken the necessary steps to secure his client's distributive share; (2) that he has failed to communicate with his client; and (3) that he neglected and failed to communicate with the Oregon State Bar and

its committees concerning this matter when requested so to do. And we add, as disclosed by the record, that when writing to his client he misrepresented the true status of the fund as of those times.

On December 16, 1952, after being informed a month previously that Mrs. Creek's share had been deposited with the County Treasurer, he wrote to her daughter, Mrs. Wells, saying: *"We have on hand to be distributed* to the heirs of your mother, Mrs. Isabel Belk Creek * * * $611.76." (Emphasis ours.) He then asks for information for "an order determining your mother's heirs."

In his letter to Mrs. Wells, dated February 28, 1953, he again speaks of the money as being "on hand." In a letter to her dated March 25, 1953, he tells her of efforts to get the money released without court proceedings, adding that "In the meantime, the money is *in the bank protected by the executor's bond."* (Emphasis ours.) At that time and for four months prior, it was actually in the hands of the County Treasurer.

As late as August 11, 1953, he continued his misrepresentation as to the custody of the funds and his activities to secure their recovery for her, this time telling Mrs. Wells: "We are going forward with the termination [sic] of heirship, and it will still be a short time before the court will order the money sent to you. *It is held in the court until that date,* and I, nor anyone else, has access to it until the final Decree is entered." (Emphasis ours.)

We are firm in the belief that neither Mrs. Wells nor any other person reading those letters could avoid the conclusion that Mr. Reinmiller was suffering her to believe that the proceedings he referred to were in the J. Q. Johnson estate, then long closed, and at

a time when he knew that a new and separate proceeding was in order to legally obtain Mrs. Wells' money. This he had never begun.

As late as February 1, 1954, he was writing to Mrs. Wells that he was "working on the matter" and would shortly send her copies of papers.

Mrs. Wells, having no further word from Mr. Reinmiller, brought the matter to the attention of the Oregon State Bar on November 30, 1954.

The defendant offers no evidence which contradicts these charges but instead claims he has no memory of the correspondence, and was at the time laboring under family problems and that he burdened himself too heavily with business and placed too much reliance on subordinates. We will later make particular reference to these claims of distracting family affairs and the burden of too much business.

It appears in the brief that subsequent to the filing of the Bar complaint, the defendant remitted to Mrs. Wells from his own funds the $611.78, less the percentage of his agreed fee.

■ Our conclusion is that the charges laid by the Bar in the matter are true and that in addition he is guilty of misrepresenting to his client the true status of her affairs as a matter of law and fact.

### The Hodson Matter

Frank Hodson was an incompetent person. Mr. Reinmiller was appointed as his guardian in 1946 and thereafter acted as his own attorney. The ward died in October, 1947. Mr. Reinmiller, notwithstanding, continued in that capacity and filed a "Supplemental Account and Report" in October, 1952, five years later. It was evidently a final accounting because it was followed closely by an order approving the ac-

count and directing distribution of the $355 then at hand. At the time the instant complaint was filed by the Bar (February 17, 1955) this distribution had not been made to those entitled thereto. The charges are delay in closing and withholding the moneys which were available to Mrs. Hodson's heirs. No suggestion is made that the defendant has commingled this fund with his own money.

The defendant admits the delay and that he still holds the guardianship assets to which reference is made. In defense the defendant represents that because of the relatively small amount to distribute, it appeared desirable to avoid the expense of probate. Apparently, the decedent had only two heirs, a brother and sister, who, in turn, had claims which would have exhausted the estate if probated. Mr. Reinmiller claims to have secured the consent of the judge in the Probate Department of the Circuit Court to make payment direct to these heirs from the guardianship estate in lieu of probate. He further asserts that the brother and sister were slow in verifying their claims and that the brother died in 1954 before this was accomplished.

Notwithstanding the possible delay of Frank Hodson's brother and sister, we find no valid answer for the first delay of five years and no convincing evidence excusing the delays following October, 1952. Had he acted with diligence after October, 1952, and employed the procedures available, he would have avoided the further complications and delay incident to the death of the brother in 1954.

### The Baker Matter

The charge in this matter is that Mr. Reinmiller received in May, 1952, a sum of money in settlement of a personal injury action for his client Baker. Out of

these funds the defendant was to pay Dr. J. B. Davis $225 for professional services rendered. Mr. Reinmiller held the money for fourteen months before paying the doctor but did so on July 31, 1953. The Bar makes no charge of wilful or intentional omission to pay Dr. Davis. It rests solely upon delay and inexcusable neglect. Meantime, the defendant failed to advise Dr. Davis or give attention to letters from the Bar Grievance Committee or from the Secretary of the Bar Association, written by Mr. Karr on October 24, 1952.

Mr. Reinmiller defends by saying that the delays were unintentional and the result of continuing and current family misfortunes and distractions. He further claims that his office girl-bookkeeper was instructed to make such checks and failed to do so, and because of his absences from his office during the period covered by this charge he was unadvised about his office situation. He denies having received the letters sent by the Bar or having any recollection of them.

For reasons that will later appear, we cannot exonerate him in terms of the excuses urged.

### The Tow Matter

■ Mrs. James V. Tow, Jr., employed Mr. Reinmiller on April 13, 1953, to secure a divorce for her. On or about the same time, she verified the complaint he prepared and gave him funds for costs and retainer. It was not, however, until November 1, 1953, seven months later, that he filed the complaint and delivered the summons for service. From this situation emanates a charge of inexcusable delay. Again, the defendant was importuned by the Bar to explain the delay and, again, he failed to respond to their inquiries or keep his client informed.

He does not deny the delays but attempts to defend the charge by urging his difficulty in locating the defendant husband. Mr. Tow was eventually found in Idaho. This excuse is made without explaining why he did not earlier proceed with service by publication.

As to the matter of the letters from the Bar and want of information to his client, the defendant claims that he answered all of the Bar's letters that he knew about and had difficulty locating his client after she had moved from Portland to Myrtle Creek, Oregon. He again blames office employees for some of the things charged.

We are satisfied that he was remiss in the particulars claimed by the bar.

### The Ester L. Berquist Matter

The defendant represented Mrs. Berguist in a divorce suit resulting in a favorable decree on September 2, 1953. The formal decree was not, however, prepared and presented to the court until about two months thereafter and then only after Judge Langtry had made contact with Mr. Reinmiller's office, demanding that it should be done without further delay. The complaint charges that Mr. Reinmiller was withholding the presentation of the decree as a leverage to enforce payment of the balance due for his services. This charge was abandoned by the Bar at the time of trial, leaving for sole consideration the question of undue delay.

In the pleadings in the divorce suit certain real property had been described by the tax title number employed by the assessor on the tax rolls. It is defendant's contention that the two months delay following the court's award was incident to securing and setting up in the decree a correct metes and bounds

description in lieu of the one previously used. He also claims delay due to "press of other work."

We do not think that the time taken to accomplish this relatively small detail was justified.

### The Van Lom Matter

Mrs. Frances Van Lom retained defendant's services on June 30, 1951, to press for a recovery of damages which she had sustained in an accident. He filed a complaint in her behalf on September 14, 1951, and prompt service was had on the defendants but no appearance by them or action on the part of Mr. Reinmiller until February 19, 1953, eighteen months thereafter, when it was discovered that Mrs. Van Lom's verification of the complaint had never been notarized. At that time, he filed an amended complaint which was answered by all defendants except one. The case was tried in October, 1953, at which time Mr. William Murray, an office associate of Mr. Reinmiller, at the instance of defendant, served as trial counsel. A favorable verdict was had for plaintiff. Mr. Reinmiller is charged with failure to answer letters of his client or explain the reasons for the delay prior to that time.

In defense, Mr. Reinmiller claims that Mrs. Van Lom's complaint to the Bar Association was inspired by spite and her disappointment that the judgment was only for $3,500 instead of $5,000, which he claims she expected. He ventures to excuse the delays by reason of his absences from his office induced by distractions growing out of his family situation.

We find that the delays from June 30, 1951, the date of the beginning of the client relationship, until February, 1953, are inexcusable and so, too, his failure

to respond to client's telephone calls seeking information.

### The Jeanine Rinker Matter

Mrs. Jeanine Rinker employed Mr. Reinmiller on May 30, 1953, to institute a divorce in her behalf, paying him some money at the time to apply to costs and retainer. Later, and before trial, he made a demand for the payment of the balance. Mrs. Rinker, with some difficulty, raised and paid the $226. It is charged that the defendant falsely represented to his client that it was necessary to make such payment of the balance before trial so that he might show the trial judge that such charges had been paid and "obtain the judge's receipt therefor" and that such procedure was a condition precedent before a decree could be entered. Soon after this money was obtained the case was heard and decree awarded to Mrs. Rinker.

Mr. Reinmiller's defense, in essence, is: that Mrs. Rinker is actuated by spite and that her representations are untrue, or because of her imperfect knowledge of English she must have misunderstood him. The client was a French woman who had come to the United States from her native country in 1948 with her American husband, to whom she was married in France. There is no charge that the fees were excessive.

The sole question here is whether or not Mr. Reinmiller misrepresented to Mrs. Rinker that it was legally necessary to do as she claims, that is, pay in advance so that Mr. Reinmiller could advise the court that such had been done "and secure a receipt from the court" before a decree could be entered. The charge appears to us as a bit fantastic. Our reading of the record inclines us to believe that Mrs. Rinker misunderstood Mr. Reinmiller. This possibility arises out

of the fact that she had never before been in an American court and was not familiar with the procedures.

We note that while laboring under her understanding of what Mr. Reinmiller had said concerning the legal necessity for prepayment of fees, she consulted with many friends who advised her correctly and contra to what she thought Mr. Reinmiller had told her. Notwithstanding, her claim to have been "shocked" and that her friends "were shocked" by Mr. Reinmiller's alleged advice, she nevertheless raised the money, returned to him and paid it without protest. Evidently, she had ceased to believe he had misled her and her confidence in him was then unimpaired for she sought no other counsel to finish the divorce suit. We exonerate Mr. Reinmiller on the Rinker count.

### Certain Elements of Reinmiller's Defense

There are certain factors of his defense which contribute an overall pattern common to many, if not all, the charges laid by the State Bar in Case 538. They may well be called excuses or pleas of extenuating circumstances or matters which should be considered in mitigation. Speaking generally, they may be classified as: (1) inefficient office help, that is, secretarial and junior legal assistants; (2) the burdens incident to too much business; and (3) distracting family matters, requiring time out of his office and trips to the state of Nebraska.

■ We are unimpressed by his repeated assertions that certain matters were not brought to his attention, especially when he was at his home, or that others had failed to carry out his directions. From the record, we glean that he had attached to his office more than the usual quota of employees and most of the time two or three able lawyers as office associates. But if his

employees failed to carry on in his absence, no matter what the reason, it was his ultimate responsibility to see that his business went forward, and if in any sense delayed by an inefficient office staff, then he had a duty to correct it. We note, too, that the oldest business from whence these charges spring began as far back as 1946 and that delays were still continuing in some matters when the State Bar filed its complaint in 1955 in Case 538.

■ The burden of too much business is an excuse which we cannot seriously countenance, and less so when coupled with the excuse of an inefficient or ineffective office organization. Our answer to this is found in the words of Mr. Justice Jackson in *Knickerbocker Printing Corporation v. United States* (1954), 348 US 875, 75 S Ct 212, 213. In response to a request for extension of time in which to file petition for writ of certiorari in that case, because of other trial work engaging the petitioning attorneys attention, he said: "* * * When more business becomes concentrated in one firm than it can handle, it has two obvious remedies: to put on more legal help, or let some of the business go to offices which have time to attend to it. I doubt if any court should be a party to encouraging the accumulation of more business in one law office than it can attend to in due time."

We give more serious attention to the defendant's representations concerning the disturbing and distracting family matters which kept him out of his office and occasioned some of his trips out of the state. Briefly, they comprehend the serious and continuing illness of his daughter, the very distressing nervous maladies of his wife, tending at times as a threat to destroy the family unity. Then, too, in 1952 and 1953, his father's serious condition necessitating

surgery and hospitalization, was followed closely by his mother's illness and death. These unhappy events in the lives of his parents required Mr. Reinmiller to make several trips to their Nebraska home. On one such trip he suffered injury to his leg which required confinement in his own home for an extended period in 1953.

It must be noted, however, that all of these trials and tribulations under which the defendant labored did not occur in the same period nor can they be said to be coincident with all the periods of procrastination and delay for which he is charged. The peak period of the distractions which took him out of his office seems to be in 1952 and 1953 when his parents' conditions called him to Nebraska and where he suffered his leg injury. It was also in 1953 that his wife's condition necessitated treatment and the attention and solicitude he properly accorded her.

No lawyer is expected to abandon pressing and urgent family demands of that character in preference to client interests. On the other hand, no lawyer can ignore his duties to his clients because of unfortunate crises in the area of his family. He cannot arbitrarily turn his attention to claims upon him arising in the home to the neglect of his professional obligations to complete matters entrusted to him by his clients. If he would absolve himself from possible censure for disregard of professional duty under such conditions, he should promptly withdraw from the relationship of attorney and client, or, with his clients' consent, place their unfinished legal business in the hands of others competent to carry it to an expeditious conclusion. Unless such consideration is given to those who are depending upon his professional services by way of saving clients from being penalized by his possible

neglect of their business, a lawyer's pleas of extenuating circumstances lose their force and effect as excuses for his failure in his duty to do what he should and could have done to protect them. More certainly, they cannot exonerate him from ignoring the legitimate inquiries which the Bar may make in behalf of his anxious and disappointed clients.

We will defer our conclusion in Case 538 until we have discussed the charges made by the State Bar in Case 597.

## CASE 597

One following the matters which are the basis for the charges made in Case 597 should keep in mind the distinctions of three different veteran entities to which frequent reference is hereinafter made. These are the Salem Chapter No. 6, Disabled American Veterans (hereinafter referred to as the Chapter) ; The Disabled American Veterans Auxiliary No. 6, of Salem (hereinafter referred to as the Auxiliary) ; and Veterans Living Memorial Building Association, an Oregon nonprofit and charitable corporation, patriotic in character (hereinafter called the Association).

The Auxiliary is in a sense an appendage of the Chapter, though having a separate charter granted by the national organization of which it was a local unit. Its membership is composed of women who are the wives or other feminine relatives of the members of the Chapter. When we later refer to "ex-members of the Auxiliary" we have in mind certain ones who were regular members of the Salem No. 6 Auxiliary before it lost its charter.

The Association came into being as a corporation as a result of action on the part of members of the Chapter.

The charges contained in this proceeding arise out of Mr. Reinmiller's representation of 17 ex-members of the Auxiliary in certain suits charging conspiracy to libel and slander, brought by him in behalf of those clients. The services which Mr. Reinmiller rendered, which we now review, were incident to a bitter and factional struggle for control and leadership in the Chapter.

The Association had as its prime interest and objective, the raising of funds for the acquisition of property and the erection of a memorial building. Considerable success was attained to that end in terms of accumulating moneys for those uses, contributed in the main by public subscription and benefits, and also by miscellaneous fund-raising enterprises, such as the sale of forget-me-nots, dances and dinners and other enterprises.

In this endeavor a large part was realized through the diligent assistance of the members of the Auxiliary.

For reasons we have no need to inquire about, the internal peace and unity of the Chapter was seriously disturbed by long-continuing factional quarrels between two opposing member groups which became, with the passing of time, exceedingly bitter and acrimonious.

The feeling engendered in the Chapter went beyond its borders to disrupt the administration of the Association. In the earlier history of the Association, the directors were of the group later ousted from the Chapter. An attempt was made to supplant them with directors chosen from the victorious group in the Chapter. This led to the quo warranto proceedings to which we will now refer.

The quo warranto proceedings were instituted in the Circuit Court for Marion County on relation of the Chapter and certain members of the Chapter, who

were partisans of one of the discordant factions. This was done in an attempt to confirm the title of the plaintiff to offices in the Association, as against the defendants Ostrander and others, parties of the other faction, who claimed to be of the legally-chosen and incumbent directors. From a judgment in favor of the plaintiffs, the defendants appealed.

Subsequent to the hearing before the Trial Committee, in Case 597 and the review and recommendation made by the Board of Governors in this disbarment proceeding, the decision in the quo warranto matter was reversed (See *State ex rel. Brewster v. Ostrander,* decided November 13, 1957, 212 Or 177, 318 P2d 284.)

For a long time before, Mr. Reinmiller had served the Association as its counsel and represented it in several suits which antedated the quo warranto proceedings. In that matter he was representing the Association with the assistance of Mr. William Murray, who shared offices with him in Portland. This client relationship with the Association was continuing when he chose to represent the women in the libel and slander cases.

The ill feeling engendered in this factional conflict within the Chapter and within the Association went even further and tinctured the members of the Auxiliary. We assume the divisions there followed the pattern of their respective kinfolk in the men's organization. One of the results of this division in the Auxiliary was a revocation of its charter.

This unfortunate situation was the cause of much litigation which followed. We content ourselves with reference only to those cases wherein Mr. Reinmiller functioned as counsel for certain of the contentious parties, and which, in turn, became the basis for the

charges made against him in the complaint of the State Bar Association in its Case 597.

As a consequence of the bitterness which stemmed from the factional fight in the Chapter and Association, seventeen of the ex-members of the Auxiliary claimed that the charter of the Auxiliary had been wrongfully revoked because of a conspiracy on the part of some of the members of the Chapter to defame them.

This group of ex-members of the Auxiliary was led by Mrs. Ostrander, wife of Ostrander, one of the leaders of the men's group who were defendants in the quo warranto matter.

Throughout the instant matter, Mr. Reinmiller appears to lean heavily on what the Ostranders (husband and wife) told him from time to time rather than depend for some of his defense upon essential official documents of the Association, if any, as conferring authority to make the payments which are the basis of the charge against him here.

In January, 1952, seventeen of the aggrieved ex-members of the Auxiliary made contact with Mr. Reinmiller concerning the alleged conspiracy to defame and he advised them to bring an action against certain members of the Chapter, and such a complaint was prepared and filed by him on or about February 1, 1952.

In March, 1953, because of adverse rulings in the first case, Mr. Reinmiller filed 14 separate actions in behalf of 14 of the same group of women who were plaintiffs in the action earlier filed in February, 1952. Each of the separate but identical actions of the ex-members of the Auxiliary named the same persons as defendants who were defendants in the first action and each alleged conspiracy to defame them. Each plaintiff alleged she was damaged in the amount of $10,000.

During the time the conspiracy actions were pending, Mr. Reinmiller, in March, 1953, was made custodian of $7,000 of trust funds belonging to the Association. As alleged by the Bar complaint, sometime prior to January 6, 1954, Mr. Reinmiller, without the consent of any of the ex-members of the Auxiliary whom he represented, or of the directors of the Association, appropriated the sum of $2,500 from the $7,000 of trust funds of the Association of which he had been given custody, and applied the same on account of attorneys' fees and expenses which he claimed were then owing to him from the former Auxiliary members, plaintiffs in the defamation actions.

Out of this background the Bar complaint against the defendant presents four different but related causes of complaint, each separately pleaded. We here summarize these charges in the order presented in the Bar's complaint, but will later discuss them in what we believe to be more nearly the order of their chronological happening:

First: Causing the preparation and distribution of pictures and news releases wrongly publicizing his retention as an attorney for plaintiffs in the defamation actions;

Second: The appropriation of $2,500 from a trust account of the Association without the consent of that corporation and applying the same on account of the plaintiffs in the defamation cases for his services, without the consent of his clients;

Third: Making excessive charges for his services in those cases and in breach of his agreement with his clients; and

Fourth: Failing to prosecute the libel cases diligently or cooperating with or advising his clients concerning said litigation.

It is the contention of the Bar that the charged deviations from the standards of professional rectitude are of such serious character that if Mr. Reinmiller were applying for admission to the Oregon State Bar, his application would be denied. ORS 9.010, supra.

The defendant admits the clientele relationships; the factional quarrels existent in the Chapter and Auxiliary; his services in the several suits and actions; and denies, generally, all other allegations of the complaint. In defense, his answer alleges that all of such suits for the Auxiliary women were "essentially interwoven and interrelated" with those in which he served the Association and that the litigation in behalf of the ex-members of the Auxiliary was "encouraged, supported and substantially financed by the Memorial Association and its officers." He also contends that the $7,000 he initially received as custodian from the trust funds of the Association was as an assurance for the payment of attorneys' fees and expenses in all of the Association's then pending and anticipated litigation and with an express understanding and direction that it should be applied for services and expenses in the defamation actions which he had brought in behalf of the former members of the Auxiliary. He further claims that the fees charged for his services are less than the fees recommended by the Bar Association schedule in like matters. His answer also asserts that at the request of the plaintiffs in the defamation cases he withdrew as their counsel on January 3, 1956.

*The Charge of Improper Use of Trust Funds in Payment of Services in the Defamation Cases*

This is by far the most serious of all the charges laid by the Bar complaint in Case 597. The other three charges are, in a sense, merely collateral to it.

The first meeting between the defendant and the 17 prospective plaintiffs in the defamation case was had at the home of Mrs. Hatfield, in Dayton, Oregon, on January 24, 1952. She was one of the ex-members of the Auxiliary. A few days previously, Mrs. Ostrander, the leading and aggressive spokesman in the cause of the ex-members of the Auxiliary, had gone with Mrs. Hatfield to Mr. Reinmiller's office, in Portland, where and when they had outlined their grievances against certain persons in one of the Chapter factions. This resulted in arousing Mr. Reinmiller's interest in their complaints and the meeting had at the Hatfield home with all of the group represented by Mrs. Ostrander was arranged.

After an explanation by Mr. Reinmiller at that January meeting of what he expected to accomplish in their behalf, all signed the retainer agreement which he had prepared before coming and whereby Messrs. Reinmiller and William B. Murray, as co-counsel, were hired to bring the action in their behalf, looking to reparation for the damages they claimed to have sustained by reason of the conduct of those who were subsequently made parties defendant.

The 17 women signed in their individual capacities. But the agreement, as prepared by Mr. Reinmiller, also carried a place for the signature of the "Disabled American Veterans Auxiliary, Unit 6." This was also executed under his direction in behalf of the "Unit" by two of the ladies present. Mrs. Richards signed as "President" and Mrs. Ostrander as "Secretary." This signature by the "Unit" presents a unique and anomalous situation, inasmuch as Unit 6 had had its charter cancelled by official action of the national or parent body of the Auxiliary, effective as of August 20, 1950, and as far as the record here shows, the charter

was never returned. Indeed, this fee agreement which Mr. Reinmiller had drawn opened with the following words: "You are hereby authorized to take up and handle our litigation *resulting from the cancellation of our Charter * * *.*" (Emphasis ours.)

We give this phase of the retainer agreement more than passing attention because of what is hereinafter said about an item of $800 which was apparently loaned or given to the Association by the Auxiliary prior to the time of the charter cancellation. This item attains some importance as we shall later learn from Mr. Reinmiller's use of it as a last-minute device made the last day of the hearing in an abortive attempt to exonerate himself from the charge of misusing trust funds to secure payment of fees for services in the defamation cases.

But, first, we turn back to the retainer agreement. The provision for the payment of services read:

"In payment for your services, you are to receive the minimum fee as fixed by the Oregon State Bar through its Advisory Schedule of Minimum Fees and Charges, of September 28, 1951, plus a reasonable hourly charge where services rendered are unscheduled. We understand that we are to prepay the costs and expenditures involved in these matters."

Either before or possibly after the contract with Mr. Reinmiller was signed, but nevertheless, at Mrs. Hatfield's home on January 24, 1952, there was some discussion in Mr. Reinmiller's presence as to how moneys for the services and expenses would be raised. There is somewhat of a variant between the testimony of those present as to the plan. This much, however, seems to be clear. They would start, as they did, to raise $100 for Mr. Reinmiller's expenses. It also ap-

pears that there was a general accord that he should have the $800 which the Auxiliary had in 1950 placed at the disposal of the Association, if and when it might be returned by the Association.

One of the difficulties encountered in our examination of the record was to ascertain exactly upon what terms the $800 was originally given to or received by the Association. It is variously said by some of the witnesses that it was a loan, or a loan to be repaid only if the finances of the Association would permit. Again, there is evidence in the office files of Mr. Reinmiller, introduced by him, that it was only a gift. The latter description of the $800 item appears on a statement made by Mrs. Ostrander in a report which she prepared, showing receipts and disbursements made by her in behalf of the Association from funds in her hands, including moneys of her own which she had advanced it. In this report the controversial item is listed as: "D.A.V. Aux. gift 1950—$800." (Ex. 1, a voluminous file of miscellaneous documents and papers from Mr. Reinmiller's office bearing on the defamation actions.)

If a gift, there was no obligation on the Association's part to repay. If, however, it was a loan, then a relationship of debtor and creditor existed, and the loan was an asset of the Auxiliary before the charter cancellation. If we assume that it was, in fact, a loan, then what right had 17 ex-members to make an assignment of the Auxiliary's ownership of this asset? This question becomes pertinent when we learn that shortly before the charter withdrawal, the Auxiliary claimed to have in excess of 100 members. Continuing the assumption that it was a loan and therefore a subsisting debt of the Association, we must conclude that the ownership of this asset reposed in the national or

parent body of Auxiliary Unit No. 6. We find in Exhibit 49A (another voluminous file Mr. Reinmiller introduced in this matter) a letter from national officers of the Auxiliary. This letter tells us that upon a revocation of a unit charter, the National By-laws require that the "property, money and effects of the revoked Unit" be delivered to the National Adjutant to be held in trust for redelivery to a successor Unit if organized.

Without impugning the motives of the 17 women who signed the agreement with Mr. Reinmiller and Mr. Murray, and conceding their possible ignorance of their legal rights in the premises, we must conclude that if the $800 given by the unit to the Association before being divested of its charter was, in fact, a loan, then these ex-members had no power or authority with reference to the disposition of the $800 if and when it was repaid by the Association. We add that the record also is silent as to whether these ladies ever attempted to authorize the Association to pay this "loan" to Mr. Reinmiller, or that the Association treated it as a loan and not a gift or ever authorized Mr. Reinmiller to liquidate its obligation of $800 to the Auxiliary, if it was, in fact, a debt of the Association.

These references to the "$800 item" are but a prelude to what we will later say concerning Mr. Reinmiller's attempted use of that item.

The Association, prior to the dates hereinafter referred to, sold the Memorial Building which it had erected for a sum around $40,000. After paying certain obligations, it invested most of the balance, except $7,000, in securities. On March 7, 1953, Mr. Ostrander, the president of the Association, and another officer, brought the Association's check in the amount of $7,000 to Portland for delivery to Mr. Reinmiller. Mr. Rein-

miller being then confined at home, it was delivered to Mr. Murray, his associate, who deposited it on that date in Mr. Reinmiller's clients' trust account.

The precise uses which these Association officers indicated that the money was to be applied is not too exact. Mr. Murray, as a witness for Mr. Reinmiller, said Mr. Ostrander told him that this money was "set aside to care for * * * anticipated litigation" and "to settle accounts with Mr. Reinmiller and between himself [Ostrander] and Mrs. Ostrander." Later, Murray stated that it was also to be used in payment of charges growing out of libel cases. But still later, he testified that when the $7,000 was received, there was no particular mention made that the money was to be used in payment of charges accruing in the libel and slander cases.

On March 16, 1953, Mr. Reinmiller drew a check against the trust fund for $2,500, payable to William Murray, who then, in turn, endorsed and returned it to Reinmiller.

We are of the opinion that Mr. Reinmiller then and until the Bar's complaint was filed treated that $2,500 as a payment upon services rendered and expenditures made in connection with the defamation cases, with one-half of the amount going to Mr. Murray, according to Murray's testimony.

We point to only a few of the record matters which tend to confirm this conclusion.

On January 6, 1954, the day before the beginning of the trial in the quo warranto matter, Mr. Reinmiller and Mr. Murray attended a specially called meeting of the directors of the Association in Salem. They brought with them a previously drafted form of minutes for the meeting, prepared by Mr. Reinmiller. This, if adopted, required the approving signatures of

all the directors. They were not signed that night, or ever, so far as the record here shows, although Mr. Reinmiller and Mr. Murray testified that they had been told that they had later been signed by some of the Directors. If so, the minutes were not produced nor was one director called by defendant to attest anything upon which Mr. Reinmiller relies in his defense in this case.

The significant feature about the minutes which Mr. Reinmiller drew is their content and purpose as revealed by the unsigned copy which was put in evidence. Its overall effect was to confirm all that Mr. Reinmiller had theretofore done with respect to the $2,500 withdrawal from the $7,000 of trust moneys given to him, and also to approve other actions in other matters. It indicates his apprehension about the propriety of his action in applying the money for the benefit of the ex-members of the Auxiliary.

Among the recitals in the ratifying resolution included in the Reinmiller draft of the minutes was a "whereas" clause, reading:

"Whereas, George C. Reinmiller has heretofore been employed by the corporation to prosecute cases in the Circuit Court of the State of Oregon for Marion County for certain women formerly members of the DAV Women's Auxiliary, and, * * *."

And in the last paragraph of the resolution we find:

"FURTHER RESOLVED, that the payments heretofore made by the corporation to George C. Reinmiller for attorney's fees, including $2,500.00 paid on account of the handling of the cases of the former members of the Women's Auxiliary to DAV Chapter 6, and all fees heretofore paid by the corporation to said George C. Reinmiller, be, and hereby are, confirmed, approved, and ratified."

The clause of the resolution relating to his employment by the Association to prosecute cases for the women runs counter to their signed agreement with him to which we earlier made reference, and counter to their own understanding, as we shall later note.

The proposed resolution for the Association directors confirms that he had drawn on the $7,000 for $2,500 to apply on accounts in the cases he had for the women when he had no right to do so, even though it might be said, as it cannot, that the directors could employ trust funds of the Association for such a purpose. A further item of confirmation is to be derived from the accounting he presented to the officers of the Association that same evening. This exhibit reveals the controverted check for $2,500 to Mr. Murray, but without a statement as to the application of the money.

The defendant testified: "In my mind the equitable thing was to apply it to the women's cases" and later said on direct examination that was the way he treated it and considered it.

Mrs. Bennett, Mrs. Richards and Mrs. Ostrander, all of the group of ex-members of the Auxiliary who retained him, when called by the Bar testified that he was to get the $800 "loan," if and when repaid by the Association, but all denied authorizing him to collect any other part of their fees from the Association. This testimony stands undisputed.

We refer to Mr. Reinmiller's letter of September 26, 1955, written to Mr. Duffy, of the Bar Committee, disclosing not only a previous appropriation of $2,500 to the women's accounts, but an attempted justification. He there says:

"* * * The total amount received into the office I believe was in excess of $3000 and somewhat less

than $4000, which would cover not only fees, but court costs, sheriff's fees and other disbursements as well."

That which amounts to "in excess of $3000," that is, the part over the $2,500, is represented by smaller amounts received directly from the women from time to time.

Mr. Reinmiller's vacillation concerning the $2,500 attains its peak on the last day of the hearing. He had completed his direct testimony at the conclusion of the hearing ten days before. On the opening of the last day and after resuming the stand, his counsel asked permission to address a few more questions. Evidently, the defendant had been reconsidering the unfavorable position in which his previous testimony and certain exhibits had placed him, because he then said:

"* * * Now, since there has been a question raised here in this hearing about the corporation wanting this $2,500 applied in the women's cases and since there is no question raised here about the $800 which was loaned by the women to the Building Association being applied on their cases, I am at this time applying $800 of the $2,500 check drawn on my trust account to the women's cases. The remainder of the $2,500 check drawn on my checking account, I am applying to the work of the corporation."

This was a last-minute about-face adjustment of accounting records initially made three years before. It was attempted even though Reinmiller then knew or should have known from his own office records, that if a $800 loan had been truly made by the Auxiliary to the Association, his clients did not own that asset, as we have earlier demonstrated. Moreover, he offered no evidence that the Association recognized such an indebtedness to the Auxiliary, or, if it did, that it had

authorized him to make payment of the debt from the $7,000 which had been given to him for other purposes. To our minds, it was a last-minute gesture of desperation on the part of one who suddenly realizes his position is untenable. It is an obvious contradiction of his earlier statement that he had learned that the Association's directors had, subsequent to January 6, 1954, approved the minutes which he submitted to them on that date.

The defendant, in his briefs, as well as by some of his testimony, attempts to justify his disbursements on the theory that there was a legal obligation on the part of the Association to absorb the expense of the slander litigation in which he represented the former members of the Auxiliary. At times he refers to the women as employees, and again rests upon what is no more nor less than a moral obligation because of their help in raising funds for the Association as they and whomsoever else were members of the Auxiliary did in the halcyon days of their charter membership. This is, indeed, a surprisingly fallacious and untenable argument for any lawyer to advance as a justification for the distribution of trust funds under the circumstances present here. Its weakness is compounded by the fact that he was the chief beneficiary of the disbursements which he made directly to himself.

We do not gainsay the value of these women of the Auxiliary to the Association, nor attempt to minimize in any respect the many good things they unselfishly did for the Association. But in so doing, they labored as other women labor in behalf of churches, schools and other charitable and public institutions to whose causes they are dedicated and do so without the expectation of the species of aid that the defendant now demands in their behalf. To their honor and credit,

they, as their contract with Mr. Reinmiller reveals, expected to pay their own bill without the aid of the Association, and, as their testimony shows, never authorized him to appeal to the Association for such help.

■ All property of any kind held by the Association by reason of its chartered character is impressed with a trust, and, as such, can be employed only for the charitable purposes and objects for which the Association was incorporated and for expenses of administration necessary to accomplish those ends. No part of the Association funds could be legally expended on the litigation in which these women were engaged.

Even if Reinmiller had been fortified with a resolution on the part of the directorate to spend trust funds for such purposes, it could not operate to legally ratify such a use.

■ Mr. Reinmiller, as an attorney, and more so because of being an attorney of long practice in Oregon and in Nebraska, before coming to this state, is chargeable with knowledge of the legal impropriety of expenditures of the kind he here seeks to justify on his part. It also exhibits a want of professional responsibility to his client the Association and its officers who were dependent upon his superior knowledge of the law. Had they given heed to his urgent advice and adopted then or later a resolution of the kind tendered by him to the corporate officers at their meeting of January 6, 1954, it would have been an act ultra vires on their part, exposing the officers to possible personal liability against which their plea of good motive and honest intent would have been no defense. That date, we note, was on the very eve of the day before the quo warranto trial, wherein their right to hold office as the directors was the principal issue. In short, in Rein-

miller's eagerness to build a tenuous defense for himself, he was ready to expose the officers of the Association to charges of misfeasance and the possibility of actions to recoup the misapplied funds of the Association.

If he had need to supplement his knowledge of the applicable law, he would have discovered the essence of the principle which here controls in the Association's By-laws, which provide:

> "*ARTICLE SEVEN*. The assets and funds of the corporation may be received from gifts or bequests and otherwise, and shall be held and used by the Board of Directors for the purpose only of this corporation and not otherwise, and shall be held and administered in trust for the purposes of this corporation and its objects."

How could he escape knowledge of it during his long period of service to the Association? And how can he now with good conscience argue against its plain impact in the instant matter?

Before closing our comment on this charge, we think it in order to observe that Mr. Reinmiller issued two other checks against the trust funds in his possession in payment of expenses directly and entirely incident to the defamation cases. We point them out although no reference is made to them in the Bar complaint or argument. They are subject to the same condemnation that we apply to the $2,500 check and for the same reasons. In defendant's accounting to the Association on January 6, 1954, to which we have already made reference, will be found two other checks, both dated March 27, 1953: one to the County Clerk of Marion County for $190.40 and one to the Sheriff of that county for $27.66. The first was for filing fees and the second for service of summonses and com-

plaints in the litigation in which the former Auxiliary members were plaintiffs. They also appear as photostatic exhibits appended to defendant's answer to the complaint of the Bar. Thus, he is responsible for a misuse of trust funds totaling $2,718.06.

■ We find that the Bar has sustained this charge, the third in its complaint in Case 597.

### The Charge Relating to Publicity

We find the defendant not guilty as to this charge. We note that the Trial Committee and the Board of Governors did likewise.

Because of our conclusions with reference to the misuse of the trust funds, we deem comment unnecessary on the other charges made in the complaint in Case 597.

Reviewing our conclusions made in each of the several matters charged in the two complaints brought against the defendant, including as they do, the two more serious charges concerning his treatment of the jurisdictional question arising in the Johnson divorce matter and his handling of the trust funds of the Association, we have no alternative than to hold that the defendant, Mr. Reinmiller, be permanently disbarred.

KESTER, J., resigned before this decision was rendered.

SLOAN, J., did not participate in the consideration or decision of this matter.