Argued at Pendleton May 3; affirmed July 12; rehearing denied
September 20, 1938

## MAIDMENT *v.* RUSSELL ET AL.
(81 P. (2d) 136, 82 P. (2d) 692)

654

In Banc.

*T. A. Weinke*, of Portland (G. W. Parman, of Condon, and Theodore E. Amstuts, of Portland, on the brief), for appellant.

*John F. Kilkenny*, of Pendleton (D. R. Parker, of Condon, and Raley & Raley, of Pendleton, on the brief), for respondents.

LUSK, J.  The plaintiff, J. W. Maidment, a judgment creditor of the defendant, Ed Russell, has appealed from a decree of the circuit court dismissing a suit brought to set aside certain transfers of real and personal property, from the said Ed Russell to his mother, the defendant, Kate Russell, which are alleged to have been made to defraud creditors.

The indebtedness which ripened into plaintiff's judgment on August 15, 1933, was for money loaned to the defendant, Ed Russell, and was evidenced by a promissory note executed by the said defendant to the plaintiff under date of October 29, 1929, for $4,013.15, due one year after date and bearing interest at the rate of six per cent per annum.  For convenience this will be referred to as the Maidment $4,000 note.

The challenged transfers consist of a warranty deed from Ed Russell to Kate Russell, dated September 9, 1930, conveying approximately 4,000 acres of land in

Gilliam county, Oregon, for a recited consideration of $51,652, and a bill of sale between the same parties of the same date, selling the interest of Ed Russell in certain personal property consisting of sheep, cattle, and farm machinery for a recited consideration of $5,300.

■ The effect of these transfers being to strip the defendant, Ed Russell, of all his property and vest the title thereto in his mother, it devolved upon the defendants to establish the good faith of the transaction, and this they attempted to do by evidence of the following facts:

Mrs. Russell had lived in Gilliam county for 53 years and during most of that time had been engaged in the livestock business. At the time of the trial in the circuit court in 1937, she was 79 years of age and she was, therefore, 61 years of age in 1919, when she acquired the real property involved in this suit. She bought this property which consisted of two adjoining tracts, known in the record as the Underwood and Greenfield ranches, and comprising approximately 4,000 acres, for a consideration of about $65,000, paying $26,000 in cash and giving mortgages to the grantors, the Underwoods and Greenfields, in the total sum of $37,110, to secure the balance of the purchase price. The price paid came to $16 per acre. The deed was taken in the names of Mrs. Russell and her son, Ed, as tenants in common. Ed at that time was 28 years of age and a bachelor. He had no money of his own and was employed by his mother. There are three other children, all of them daughters who are married.

On July 21, 1922, Mrs. Russell conveyed to Ed, by warranty deed, for a recited consideration of $10, all her interest in the 4,000 acre ranch, subject to the Underwood and Greenfield mortgages, which Ed assumed

and agreed to pay, although, in fact, by that time Mrs.
Russell had herself paid approximately $7,000 on the
Underwood mortgage. At the same time she sold to
Ed a half interest in the livestock and other personal
property on the ranch and Ed gave his mother a prom-
issory note for $51,652, representing the purchase price
of the land and the personal property. This note, dated
July 21, 1922, was payable one year after date and
bore interest at the rate of five per cent per annum.
Thereafter, and until the difficulty came to light which
led to this litigation, the defendants were partners in
the operation of the ranch. Mrs. Russell, a dominat-
ing personality, appears to have been the managing
partner. She kept her hand on the finances and when
money came in from the sale of sheep or other sources,
before dividing with her partner, she applied what was
needed to the payment of interest accruing on his note
to her. At the same time she paid off, largely from
her own funds, the mortgages on the land. The Green-
field mortgage was satisfied in 1924, and the Under-
wood mortgage in 1927.

On April 21, 1928, Ed Russell gave his mother an-
other note for $51,652, in renewal of the note of July
21, 1922.

About 1926, Ed Russell became acquainted with a
man named Leo Shelley and fell under his malign in-
fluence. Shelley induced Ed Russell to sign notes with
him as an accommodation endorser or maker. At first
these notes were paid. Latterly they were not, and
so there came about Ed Russell's undoing and this liti-
gation. In 1930, besides other obligations, Ed Russell
was indebted to the plaintiff on a promissory note for
$5,000 which Ed signed as accommodation maker with
Shelley on March 13, 1930. This note fell due three
months thereafter and, not having been paid by the

summer of 1930, the plaintiff commenced action on it. Mrs. Russell was then for the first time apprised of her son's folly. She then learned not only about the Maidment note for $5,000 but also about three other notes which Ed had signed to raise money for Shelley, namely, a note to V. A. Taylor, on which approximately $3,500 was owing, a note to C. K. Barker, on which $1,300 was owing, and a note to the First National Bank of Condon, on which approximately $1,000 was owing. She did not learn at that time, nor until nearly two years later, of the existence of the note involved in the present suit, which was not then due. Ed did not tell her about it because it was not due and because Shelley had assured him that he would take care of it.

This note was signed by Ed Russell alone, but Shelley got the money. Besides this obligation, Ed was also indebted to John J. Monahan on a note in the sum of $2,800, then long overdue and concerning which he informed his mother. Shelley had no connection with this note.

Mrs. Russell then proceeded to act in the situation which faced her. On September 5, 1930, she took a note from her son for $45,852, the amount then owing on his obligation to her, and a mortgage on the ranch securing this note. Next she saw a banker about raising money with which to pay off Ed's indebtedness. She was advised by the banker and also by a lawyer whom she consulted not to be content with the mortgage, but to get a deed, and so on September 9, 1930, the deed now under attack was executed by Ed, reciting the consideration of $51,652, the amount of Ed's original note to her, and at the same time Ed gave her a bill of sale to his interest in the personal property on the ranch, this being the other instrument said to be tainted with fraud.

Further, to secure herself for the indebtedness of Shelley and her son, which she was assuming, Mrs. Russell took from Shelley promissory notes aggregating approximately $11,000, and a mortgage to secure their payment on all of Shelley's real and personal property. These notes covered the Maidment $5,000 obligation and the obligations to Taylor, Barker, and the First National Bank of Condon, but not the Maidment $4,000 note. Thus, with the addition of the Monahan note, Mrs. Russell paid or undertook to pay the sum of $14,000 of her son's indebtedness. She was compelled later to foreclose the mortgage that Shelley gave her and realized on execution the sum of $1,049. Eventually she paid the entire $14,000.

Mrs. Russell's first knowledge of the Maidment $4,000 note came to her in a letter written to Ed Russell by the plaintiff's attorney, Mr. H. H. Hendricks, under date of July 20, 1932, asking Ed to make arrangements for payment. In his absence Mrs. Russell opened and read the letter. She, thereupon, wrote to Mr. Maidment, suggesting a meeting with him at Condon and that if he would forego some of the principal and interest, she would see what she could do. Maidment referred her letter to his attorney, who wrote Mrs. Russell, but nothing came of the negotiations and the matter rested until this suit was filed on June 6, 1934.

There is no direct evidence in the record contradicting any of the foregoing facts, except the claim that Mrs. Russell did not know of the $4,000 note at the time of the conveyance to her on September 9, 1930, and the evidence that personal property constituted part of the consideration for the note for $51,652.

As to the rest, the plaintiff relies on circumstances which, it is contended, destroy the convincing

effect of the defendants' story and brand them as perjurers and fabricators of evidence. It is plaintiff's theory and contention that the note for $51,652, dated July 21, 1922, and the renewal note in the same amount, dated April 21, 1928, claimed by the defendants to represent the purchase price of the land and the personal property which Ed Russell received from his mother in the year 1922, are fraudulent and fictitious, that in 1930 Ed was not indebted to his mother at all, and consequently that the conveyances were voluntary and made for the purpose of defrauding the plaintiff.

In the lower court plaintiff contended that the 1922 conveyance was a gift of the land from mother to son; now he urges, not that it was a gift but that the consideration was Ed Russell's agreement to pay off the mortgages.

The principal circumstances to which plaintiff points as compelling this conclusion are these:

(1) The land was worth not to exceed $7 an acre in 1922, or approximately $28,000. Mrs. Russell's half interest, therefore, would be worth only $14,000, and against the whole tract there was a mortgage of $30,000; thus, she had no equity in the land and it is not reasonable to suppose that she would have exacted from her son this unconscionable agreement to pay her $51,652 in one year, besides assuming the mortgages.

(2) The deed of July 21, 1922, when recorded, bore no United States Internal Revenue documentary stamp as required by law; sometime thereafter a stamp in the denomination of $5 was affixed to the instrument and an X marked on it with ink. The amount of the stamp indicates a much smaller consideration than $51,652, while its unexplained appearance on the deed after recording, together with the X across its face,

is another link in the chain of circumstances pointing to fraud.

(3) Financial statements given by the defendants to the First National Bank of Condon contain no mention of the note for $51,652.

These notes of July 21, 1922, and April 21, 1928, are in evidence, and on their face give no indication of fraud. Either they represent a genuine obligation of Ed Russell to pay his mother the amount stated in them or' they are part of a carefully devised plan to defraud the plaintiff. If plaintiff's view of the case is to be accepted, it must be said that the defendants were so astute to give the appearance. of truth to a lie that they conceived the idea of the renewal note of April 21, 1928. But it might well be argued that had the defendants been engaged in an enterprise of that character, they would have been equally astute not to lay themselves open to the kind of attack which is now made; they would have named a consideration which could be more easily proved as the value of the property, and would have affixed to the deed a documentary stamp corresponding in denomination to the supposed consideration.

It is quite true that Mrs. Russell's equity in the property was not worth $51,652 in 1922. She testified that the land was worth $10 an acre at that time. Whether or not this is a better opinion than the lower estimates of witnesses called by the plaintiff, that was probably her judgment of the value of the land at that time. On that basis, the equity in the land would be approximately $10,000—4,000 acres at $10 an acre, with $30,000 unpaid on the mortgages. The note, however, according to Mrs. Russell, was also given in consideration of the transfer of one-half of the personal property, consisting of 600 or 700 sheep, 1,000 lambs, about

35 head of cattle and the farm machinery. Ed Russell testified that no personal property was included in the transaction, but his testimony indicates that he is a man of limited intelligence and poor memory. Mrs. Russell, at the age of 79, evinced as a witness a far keener mind than his. Since she was taking her son into partnership, the probabilities support her statement that she transferred to him a half interest in the personal property. It is somewhat difficult to determine from the record the value of this property in 1922, though there is evidence which would support a valuation of $20,000 to $25,000. While the deed only conveys Mrs. Russell's half interest in the land, it should be remembered that three years before when she bought the property she had taken the conveyance in their joint names, notwithstanding Ed paid no part of the consideration. Now, she was making him a partner in a profitable business. She was bestowing upon him the ownership of all this land which her industry and energy had enabled her to acquire. She no doubt had the right, or thought she had, to look forward to a future of continued prosperity, such as the business had enjoyed in the past. Notwithstanding his agreement in the deed to pay off the mortgages, she probably intended to do what she actually did, that is to pay them herself.

Looked at realistically and not with too technical an eye to the form which the transaction took, the substance of the matter is that Ed Russell received for a consideration of $51,652, property which in the end cost his mother nearly $65,000, together with a half interest in her personal property and the business which she had created and carried on for many years. In this view of the evidence—and it is a permissible view—the purchase price agreed upon is understandable.

■ It may be said that the plaintiff's view is permissible also, but it should be borne in mind that the probability is against fraud. It is presumed that private transactions are fair and regular. "A court of equity will never presume a fraud when the transaction under investigation is equally susceptible of two explanations, one of which is consistent with a fraudulent intent and the other with good faith and fair dealing. In such cases that construction of the acts of the parties which is consistent with good faith and fair dealing will be preferred": *Ball v. Danton*, 64 Or. 184 (129 P. 1032). And as Mr. Justice Burnett observed in *Coffey v. Scott*, 66 Or. 465, 472 (135 P. 88), "although the burden of proof rests upon a defendant to explain a transaction between near relatives, yet it is not requisite to convince him who would not believe though one arose from the dead."

In addition to this presumption of good faith which we must apply in weighing the evidence and assessing the conduct and motives of the defendants, Mrs. Russell is entitled to have her good faith or want of it determined in the light of the fact that immediately upon learning of her son's financial debacle she took steps to raise $14,000 to pay his creditors.

It is difficult to escape the force of the suggestion that if she were the sort of person to conceive and carry out the disreputable scheme attributed to her in order to save $4,000, she would have used the same device in order to save $18,000.

As to the financial statements to the First National Bank of Condon, it is enough to say that they were given at a time when the defendants were partners. As a partnership the asset "washed" the liability. The defendants' failure to include the item in these statements is not sufficient, in view of the other evi-

dence, to convince us that the indebtedness did not exist.

■■ Mrs. Russell, as we have stated, denied that she learned of the existence of the Maidment $4,000 note until the year 1932, and her son's testimony in this regard supported hers. The only evidence to the contary came from Shelley who was an impeached, and, evidently, a biased witness. On this question, which was purely one of veracity, the lower court found for the defendant. This court should be slow to reject such a finding made by a circuit judge of long experience, who had the advantage, which necessarily we lack, of seeing the witnesses, hearing them testify, and observing their demeanor on the witness stand. No improbability inheres in the claim that Ed Russell did not tell his mother of the existence of this note in September, 1930. It seems likely that had she known of it she would have made provision for its payment as she did for the other obligations. We concur in the circuit court's finding on this issue. The question of fraudulent intent under the statute is one of fact: § 63-510, Oregon Code 1930. Not knowing of the note, Mrs. Russell could have had no intent to defraud the plaintiff and no motive for resorting to all the elaborate pretense and sham with which she is charged. We find it unnecessary to discuss other arguments advanced by the plaintiff in support of his view of the facts. We have given them all careful consideration. The preponderance of the evidence, in our opinion, establishes the genuineness of the indebtedness which Ed Russell contracted in July, 1922, when his mother conveyed to him her interest in the ranch property and made him a partner. We are not convinced of the only other alternative presented, namely, that the defendants fabricated this evidence and concocted this story and perjured themselves

to establish it in court. Mrs. Russell, at least, did not manifest such a character in the things she did about which there is no controversy.

In view of our conclusion upon the facts, it is not necessary to do more than make bare reference to the law governing a case of this character. In this state that law is statutory. See §§ 63-507, 63-510, 63-511, Oregon Code 1930. The governing principles were recently restated in *Connel v. O'Connor,* p. 348 ante (80 P. (2d) 542), decided June 21, 1938. A debtor in failing circumstances may prefer one creditor over another. When a debtor conveys the whole of his estate to a near relative, ostensibly in satisfaction of his debt to the latter, and the conveyance is attacked in a suit by creditors, the grantee must establish by satisfactory proof that there was a valuable and adequate consideration for such conveyance and give a clear and concise account of the items constituting such consideration. In *Connel v. O'Connor,* supra, we set aside a conveyance between near relatives as made with intent to defraud, because the defendant, grantee, had failed to produce that clear and concise account of the items constituting the alleged indebtedness which the law demands. In the case at bar the consideration for the note which Ed Russell gave to his mother in the year 1922 is established by abundant evidence and the attempt to impeach that note as fictitious has, in our opinion, failed. Ed Russell did no more than prefer his mother as a creditor. She took the conveyance of the land and the bill of sale to the personal property without knowledge of the indebtedness which the plaintiff is seeking here to collect, and she gave a valuable and adequate consideration, namely, the release of her son's indebtedness to her and the payment of $14,000 to his other creditors.

The decree dismissing the suit is therefore affirmed, and the defendants will have judgment for their costs and disbursements.

ROSSMAN and RAND, JJ., not sitting.

Petition for rehearing denied September 20, 1938

## ON PETITION FOR REHEARING
### (82 P. (2d) 692)

LUSK, J. A petition for rehearing, filed by the appellant, calls our attention to two particulars in which our opinion is not in harmony with the record. The opinion states that the land conveyed by Ed Russell to his mother, Kate Russell, on September 9, 1930, consisted of approximately 4,000 acres. The petition says that the description in the deed covers approximately 5,300 acres. The deed does not state the number of acres and the description includes several lots, the dimensions of which are not given. Without these lots there are something less than 5,100 acres, according to our computation.

We had assumed that the land conveyed by this deed was the same land which Mrs. Russell conveyed to her son on July 21, 1922, that is to say, the Underwood and Greenfield ranches comprising something in excess of 4,000 acres. It appears, however, that Ed Russell owned other lands which he also conveyed to his mother by the deed of September 9, 1930, but this cannot affect the result. The evidence is, that the Underwood and Greenfield tracts were worth $6 an acre in 1930. If we assume that the additional acreage deeded to Mrs. Russell by her son was of the same value, then the entire tract, even if we should accept the assertion in the petition that it contained 5,300 acres, was worth only $31,800,

whereas, Ed Russell was indebted to his mother in the sum of $45,852, a sum in excess of the combined value of the real and personal property which he transferred to her, to say nothing of the $14,000 of his indebtedness which she paid.

The petition further avers that we were in error in assuming that the partnership between the defendants had its beginning in 1922, instead of 1919. We have again read the testimony on that point and agree that the record supports this criticism. This date, however, is not of great importance. The pivotal question in the case relates to the genuineness of the promissory note for $51,652, which Ed Russell gave to his mother on July 21, 1922, as representing the purchase price of lands which she deeded to him and of a half interest in her livestock and other personal property. The partnership relation is a circumstance which has a bearing on that question, but its significance is very little affected, whether it began in 1919 or 1922.

Apart from these two matters, the petition is merely a reiteration of arguments and contentions heretofore pressed upon us by the appellants and to which we gave careful consideration before rendering our decision. We deem further discussion unnecessary. We have examined the record again and are satisfied of the correctness of the decision.

The petition for rehearing will therefore be denied.

ROSSMAN and RAND, JJ., did not participate.