Argued and submitted October 7, 1986, accused suspended for 63 days March 31, 1987

In re Complaint as to the Conduct of
# VERDEN L. HOCKETT, JR.,
*Accused.*

(84-77; SC S32958)

734 P2d 877

James H. Spence, Roseburg, argued the cause and filed the brief for accused.

George A. Reimer, Portland, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer discipline case the accused was charged and found to have violated, *inter alia, former* DR 1-102(A)(4), presently DR 1-102(A)(3), (lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation), DR 5-105(A) (conflict of interest) and DR 7-102(A)(7) (lawyer shall not assist client in conduct known to be illegal or fraudulent).[1] We, too, find that the accused violated those rules and order that he be suspended from the practice of law for 63 days.

### CONFLICT OF INTEREST

DR 5-105 provided:

"(A)   A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"(B)   A lawyer shall not continue employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, except to the extent permitted under DR 5-105(C).

"(C)   In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

The Trial Panel made these findings, which we adopt as our own:

"[1] Accused was admitted to the practice of law in 1957 after a strong business background in business administration. Following brief employment with the Oregon State Tax Commission, and approximately five (5) years as a Deputy District Attorney, for Douglas County, Accused commenced private practice in 1963. Approximately 20 years ago Accused

---

[1] References are to disciplinary rules in effect when the conduct at issue occurred. DR 1-102, DR 5-105 and DR 7-102 have subsequently been amended in a manner which does not affect the substance of the rules. References to DR 1-102(A)(4) in the text are to *former* DR 1-102(A)(4).

became acquainted with Kenneth Neptune and Lyle Beecroft which developed into a social friendship, including the spouses. Accused commenced representing both Neptune and Beecroft in various matters through the years which included representation of their spouses. In 1980 Accused represented Neptune and Beecroft in the formation of a corporation known as BBN Enterprises. Included in the initial incorporation was Donald Beckley who left the corporation soon after formation, leaving as sole stockholders Neptune and Beecroft. In 1982 BBN Enterprises became indebted to Douglas National Bank of Roseburg in the sum of $147,000.00 and to Northwest Acceptance Corporation in the amount of $209,000.00. Both of said debts were personally guaranteed by Beecroft and Neptune but not their spouses.

"[2] In June of 1983, Accused represented Neptune in an action brought against him by Dirksen. In July and August of 1983, Accused represented Beecroft and spouse in a foreclosure action brought by Davis. In July 1983 through December 1983, Accused represented BBN Enterprises in settling loggers' liens with Roseburg Lumber Company.

"[3] On August 16, 1983, Accused accompanied Beecroft and Neptune to Salem, Oregon, to confer with an attorney about possible bankruptcy. On August 17, 1983, at 10 a.m. Accused conferred with Mrs. Beecroft concerning a divorce and at 12 noon, Accused conferred with Beecroft and Neptune on BBN matters. On August 18, 1983, Accused filed a petition for divorce on behalf of Mrs. Beecroft and on the same date secured the signature of Mr. Beecroft to a waiver and consent form which supported a motion filed by Accused on behalf of Mrs. Beecroft to waive the 90 day waiting period for obtaining a decree. On that same date, August 18, 1983, Accused met with Ken Neptune at 11 a.m. and 3 p.m. and a divorce information sheet was taken concerning the Neptunes. On August 21, 1983, a petition for divorce was filed by Accused on behalf of Mrs. Neptune, and on the same date a motion was filed by Accused on behalf of Mrs. Neptune to waive the 90 day waiting period for obtaining a decree.

"[4] On August 25, 1983, Accused took a decree of dissolution on behalf of Mrs. Beecroft effectively awarding to her all of the real and personal property of the parties save and except the stock of BBN Enterprises and respondent's personal effects and belongings. The decree was to be effective September 24, 1983. On August 30, 1983, Accused took a decree of dissolution on behalf of Mrs. Neptune effectively awarding to Mrs. Neptune all of the parties' real and personal

property, except a 1982 GMC pickup, respondent's interest in BBN Enterprises, and respondent's personal effects and belongings. The Neptune decree was to be effective September 30, 1983. On September 1, 1983, Accused had a conference with Beecroft and Neptune and on September 2, 1983, Accused represented Beecroft and Neptune in a meeting with the representatives of Douglas National Bank of Roseburg concerning their indebtedness, at which time the parties were notified action was to be taken to collect the delinquent loans.

"[5] Despite the testimony of Accused, the obvious inference and conclusion from all of the evidence is that Accused was fully advised of the financial difficulties of Beecroft and Neptune and BBN Enterprises, that he had an ongoing attorney/client relationship with them and the company from June of 1983 through December 1983, and that during the same period he represented Mrs. Beecroft and Mrs. Neptune in the dissolution proceedings against their husbands. * * *."

DR 5-105(A) commands undivided loyalty to a client. "It is never proper for a lawyer to represent clients with conflicting interests no matter how carefully and thoroughly the lawyer discloses the possible effect and obtains consent." *In re Jans,* 295 Or 289, 295, 666 P2d 830 (1983). *Accord In re Johnson,* 300 Or 52, 58-59, 707 P2d 573 (1985).

Here, during August and September 1983, the accused was concurrently representing (a) Mr. Beecroft and Mr. Neptune on BBN matters, and (b), Mrs. Beecroft and Mrs. Neptune in their dissolution complaints against Mr. Beecroft and Mr. Neptune.

As the lawyer for Mr. Beecroft and Mr. Neptune, the accused's obligation was to protect them from the claims of creditors, to the fullest permissible extent. As the lawyer for Mrs. Beecroft and Mrs. Neptune, his duty was to maximize their award in the dissolution proceedings, by way of property division, spousal support or both. The persons from whom such property or spousal support would be obtained were his other clients, Mr. Beecroft and Mr. Neptune.

There is no way that the accused could discharge his duty of unswerving loyalty to either spouse without violating that duty to the other spouse. The conflict was patent.

Although the accused and others testified that his

conflict of interest was discussed, no valid consent was obtained. No valid consent could be obtained in such a situation. *In re Jans, supra,* 295 Or at 295. *Compare* Aronson, *Conflict of Interest,* 52 Wash L Rev 807, 826-27 (1977).

This principle could not be better demonstrated than under the present facts. The property transfers likely were part of a collusive effort on the part of all four spouses and the accused to move assets out of the reach of creditors. Although the financial consequences of the accused's representation are not clear, in this case it may have been the wives who paid the bigger price for the lack of independent representation. They were conveyed property. The conveyances were subject to being voided as "fraudulent." *See infra* at 161-2. Spousal support was not discussed, as is evident from the testimony of Mrs. Beecroft:

"Q. Did you feel that the property you got in the divorce, being more than what he was getting, justified you in not asking for alimony from Mr. Beecroft?

"A. I was not aware that I could get alimony, I thought it was something movie stars got.

"Q. Was Mr. Beecroft bringing in a regular income at that time?

"A. I think we went over that regular income, he did not have a regular salary coming in every month, he was buying and selling equipment.

"Q. Did you feel that he was in a position to make monthly support payments to you after the divorce?

"A. I never thought about it because it was not discussed."

## CONDUCT CALCULATED TO AVOID CREDITORS' CLAIMS

The accused also was charged with violating ORS 9.460(3) and (4) which provide, and DR 1-102(A)(4) and 7-102(A)(1) and (7), which provided:

### ORS 9.460

"An attorney shall:

"* * * * *

"(3) Counsel or maintain such actions, suits, or proceedings or defenses only as may appear to the attorney legal and

just, except the defense of a person charged with a public offense;

"(4) Employ, for the purpose of maintaining the causes confided to the attorney, such means only as are consistent with truth, and never seek to mislead the court or jury by any artifice or false statements of law or fact;

"* * * * *."

## DR 1-102(A)(4)

"(A) A lawyer shall not:

"(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

## DR 7-102

"(A) In his representation of a client, a lawyer shall not:

"(1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

"* * * * *

"(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."

On these charges, the Trial Panel found:

"[T]he evidence clearly supports the finding that Accused actively assisted Mr. and Mrs. Beecroft and Mr. and Mrs. Neptune in a course of conduct designed to hinder creditors of BBN Enterprises from reaching assets of the parties through the use of the dissolution proceedings."

We agree with that finding and adopt it as our own. In addition, we find that on November 18, 1983, Northwest Acceptance Corporation filed a complaint in Lane County Circuit Court against BBN, the Neptunes, the Beecrofts and Beckley. Its fifth claim for relief alleged that the conveyance from Kenneth Neptune to Barbara Neptune, resulting from the divorce decree, was fraudulent. It sought to set aside the conveyance. Its sixth claim for relief made the same claim and sought the same relief against Lyle Beecroft and Patricia Ann Beecroft. Summary judgment was entered against Kenneth Neptune and Barbara Neptune holding the Neptune decree to be fraudulent conveyance. Summary judgment was entered

against Lyle Beecroft holding the Beecroft decree to be a fraudulent conveyance. The claim against Patricia Beecroft was the only remaining claim at the time of the hearing in this case.

On or about September 23, 1983, Douglas National Bank filed a complaint against the Neptunes and the Beecrofts which also sought to set aside the conveyances resulting from the divorce decrees. At the time of the accused's hearing in this case, this complaint was still in litigation.

We also find that, in prosecuting the dissolution cases, the accused was acting on behalf of all four spouses in attempting to get the real property in the hands of the wives with the intent to make the property unavailable to the creditors of Mr. Beecroft and Mr. Neptune. The transfers, albeit under an uncontested decree, were made in anticipation of the impending actions of Northwest Acceptance and Douglas National Bank, the transferors were insolvent, and a confidential relationship existed between the grantor and grantee. Although the court documents are not in the record, there was testimony that a proceeding to set aside the conveyances was filed and was successful.

The question is whether this conduct violates any of the rules or statutes quoted above.

### Fraud and Deceit

Both the Bar and the accused suggest that the terms "fraud" and "deceit" refer to fraud and deceit that are actionable in Oregon. We decide this case on that basis. This is consistent with Rule 8.4 of the ABA Model Rules of Professional Conduct. *See also* Wolfram, Modern Legal Ethics 698 (1986).

As stated earlier, in pressing the dissolution cases, the accused was acting with the intent to transfer the real property to Mrs. Beecroft and Mrs. Neptune to keep the property from the reach of creditors of Mr. Beecroft and Mr. Neptune. There is no evidence, however, suggesting that the transfer was a subterfuge in the sense that any interest was secured or reserved to the transferor husbands. The evidence points to the conclusion that the husbands were insolvent beyond hope and that rather than have their creditors get the

property, the parties would arrange for its transfer to the wives.

We find no fraud or deceit in a tortious sense. Fraud and deceit require, among other things, a false representation to another, with the intent that the other act upon the false representation to his or her damage. *Rice v. McAlister,* 268 Or 125, 128, 519 P2d 1263 (1974). We cannot say that the accused was guilty of fraud or deceit in that sense. His conduct was more in the nature of one intending illegally to put property beyond the lawful claims of creditors. This is discussed below.

### Dishonesty

The term "dishonesty" is not defined in the code. In his supplemental brief filed after oral argument at the court's request, the accused suggests that dishonesty "would cover any misconduct intentionally done in bad faith." This definition fails because "misconduct" itself requires a definition.

In its supplemental brief, the Bar states:

"A clear and comprehensive definition of the word 'dishonesty' does not exist in Oregon attorney discipline case law. A standard dictionary definition of 'dishonesty' is not particularly helpful in this context. Webster's New World Dictionary, College Edition (1966) defines the term 'dishonest' as 'not honest; lying, cheating, etc.' 'Dishonesty' is defined several ways: '1. the quality of being dishonest; dishonest behavior; deceiving, stealing, etc. 2. a dishonest act or statement; fraud, lie, etc.' As can be seen, dishonesty is commonly defined as deceiving, fraud, cheating, lying or stealing.

"* * * * *

"The best the Bar can do to clarify DR 1-102(A)(4) in this context is to suggest that dishonesty can be engaged in actively or passively and has an element of knowledge that the conduct engaged in is contrary to commonly accepted norms of fair and open dealing with others. Trustworthiness is an essential principle embodied in DR 1-102(A)(4)."

Dishonesty is defined by Black's Law Dictionary 421 (5th ed 1979), as a "[d]isposition to lie, cheat or defraud; untrustworthiness; lack of integrity." Trustworthiness and integrity are key concepts in the Code of Professional Responsibility as well as in Black's definition. *See, e.g.,* EC 1-1, 9-6. This is consistent with the obligation as stated by DR

1-102(A)(4)'s predecessor — Canon 22 of the former Canons of Ethics. DR 1-102(A)(4) is "substantially equivalent to, but somewhat broader than, Canon 22 of the former Canons of Ethics which imposed upon an attorney an *obligation to be candid and fair* 'before the Court and with other lawyers.'" ABA Formal Opinion 337 (August 10, 1974)(emphasis added).

On the meaning of "dishonesty," as that term is used in DR 1-102(A)(4), courts of other jurisdictions usually determine whether acts constitute dishonesty on a case-by-case basis. One court has stated that a lawyer's acquiescence in a client's conveyance of property to avoid lawful claims of creditors would be conduct in violation of DR 1-102(A)(4), which "simply stated, requires honesty." *In Matter of Proceedings Against Sedor,* 73 Wisc 2d 629, 640, 245 NW2d 896 (1976).

Assisting clients to cheat creditors is "dishonesty" under DR 1-102(A)(4). We conclude that the accused's act of assisting his clients in "fraudulent" transfers, *see infra* at 161-2, was done with the intent to cheat creditors of their lawful debts. Such conduct is "conduct involving dishonesty," a violation of DR 1-102(A)(4).

### ORS 9.460(4) and Misrepresentation

As stated earlier, ORS 9.460(4), requires that an attorney "[e]mploy, for the purpose of maintaining the causes confided to [him] such means only as are consistent with truth, and never seek to mislead the court or jury by any artifice or false statements of law or fact * * *."

*In re Hiller,* 298 Or 526, 531-32, 694 P2d 540 (1985) involved ORS 9.460(4), and our comments there are germane here:

> "The obligations stated in ORS 9.460(4) and DR 1-102(A)(4) all deal with honesty, and they unquestionably overlap, but they are not identical. The primary focus of ORS 9.460(4) is on litigation. Its final provision forbids seeking to 'mislead the court or jury by any artifice or false statement of law or fact.' The beginning of subsection (4), however, is broader. It commands attorneys to employ 'such means only as are consistent with truth' in 'maintaining the causes confided to' them. * * *."

ORS 107.065(2) permits a court to grant a decree

prior to the 90 days required by ORS 107.065(1) on motion "supported by affidavit setting forth grounds of emergency or necessity and facts which satisfy the court that immediate action is warranted or required to protect the rights or interest of any party or person who might be affected by a final decree * * *." The affidavits prepared and filed by the accused refer to "emotional stress and strain upon respondent and myself" as the emergency or necessity for immediate action. We find that this was a part of the effort to avoid the claims of creditors, an "artifice" to further the effort to make the property unavailable to creditors. It was not the use of "means only as are consistent with truth" as required by ORS 9.460(4) and involved a "misrepresentation" for purposes of DR 1-102(A)(4).

## Harassment (DR 7-102(A)(1))

DR 7-102(A)(1) stated that a lawyer shall not

"[f]ile a suit * * * or take other action on behalf of the client when he *knows* or when it is obvious that such action would serve *merely* to harass or maliciously injure another." (Emphasis added.)

■ We must apply the rule according to its terms. We cannot say that the accused's conduct in his handling of the dissolution cases "serve[d] *merely* to harass or maliciously injure" the creditors. His conduct did harass and injure the creditors, but that was not his sole aim.

## Illegal Conduct (DR 7-102(A)(7))

■ DR 7-102(A)(7) prohibits lawyers from engaging in conduct "the lawyer knows to be illegal" in the representation of a client, or as more generally stated by Canon 7, a lawyer's zealous representation of a client must remain "within the bounds of the law." A lawyer must be able to advise and assist clients in their affairs without fear of discipline if he is wrong in interpreting close questions of law. He or she must be given some latitude to be wrong. If, for example, a close question were presented whether a course of conduct violated a criminal law, we would not discipline a lawyer under DR 7-102(A)(7) for advising or assisting a client to engage in conduct "the lawyer *knows* to be illegal or fraudulent." (Emphasis added.)

■        The rule clearly prohibits lawyers from counseling or assisting clients to engage in criminal conduct. But the rule means more than that. Zealous representation is limited by more than the criminal law. Read in conjunction with EC 7-1, DR 7-102(A)(7) defines and limits the duty of the lawyer to securing for his client "available legal rights and benefits" or "lawful objectives through legally permissible means."

It is well settled that some conveyances may not be used to avoid the lawful claims of creditors. *Former* ORS 95.070[2] provided:

> "Every conveyance * * * of any estate or interest in lands, goods or things in action * * * made with the intent to hinder, delay or defraud creditors or other persons of their lawful suits * * * debts or demands, * * * as against the person so hindered, delayed or defrauded is void."

Although this statute is not part of the criminal law, it in effect prohibits specified conduct and provides for a remedy to undo the effect of such conduct. Here, the lawyer assisted the client in what has been determined to be an unlawful conveyance. *See Nelson v. Hansen,* 278 Or 571, 577, 565 P2d 727 (1977); *Boone v. Burden,* 259 Or 402, 404, 487 P2d 74 (1971); *Maidment v. Russell,* 159 Or 653, 664, 81 P2d 136, 81 P2d 692 (1938); *Hesse v. Barrett,* 41 Or 202, 204, 68 P 751 (1902); *Jolly v. Kyle,* 27 Or 95, 101-02, 39 P 999 (1895).

The accused's conduct is similar to conduct in *In re Gooding and Ricker,* 254 Or 38, 456 P2d 998 (1969). There the lawyers filed a divorce action on behalf of a client's wife just before a judgment was entered against their client in a case they handled for him. The divorce was filed in a different county and sought to have all of the husband's property awarded to the wife. One of the lawyers filed a *lis pendens* notice in the county in which the first action was pending earlier in the day that the decree of foreclosure against the husband was filed. This court reprimanded the lawyers for participating in a scheme to defraud the husband's creditors.

---

[2] ORS 95.010 to 95.100 was repealed by Oregon Laws 1985, chapter 664, section 16, and replaced with the Uniform Fraudulent Transfer Act, codified at ORS 95.200 to 95.310. ORS 95.230(2) codifies the factors used to determine intent to hinder, delay or defraud creditors enumerated in Oregon caselaw and discussed in this opinion. A conveyance may be a "fraudulent conveyance" even though the elements of common law fraud are not required to be proved.

Advising and assisting clients to engage in conduct forbidden by statute violates DR 7-102(A)(7). We find that the accused knowingly engaged in assisting his clients in conduct "that the lawyer knew to be illegal" under DR 7-102(A)(7).[3]

■        ORS 9.460(3) requires lawyers to counsel or maintain such actions "only as may appear to the attorney legal and just." We have found the accused guilty of violating DR 7-102(A)(7) by knowingly engaging in conduct known "to be illegal." That also makes out a violation of ORS 9.460(3), and we so find. *Compare In re Reinmiller,* 213 Or 680, 695, 325 P2d 773 (1958).

## SANCTION

■        We now consider the sanction. Beecroft and Neptune were hopelessly insolvent; there was no way that they could meet creditors' claims. The record shows that the marriages were not happy ones. Apparently the decision was made to whip through the dissolutions, saving to the wives the maximum possible property, for the wives had not signed the notes to the creditors. Otherwise, the creditors would get the real property.

The accused, for little or no personal financial gain, apparently perceived that the best he could do for the four of them was to place Mr. Beecroft's and Mr. Neptune's property interests in the hands of the spouses. There is testimony that either the accused or one of his clients, at a meeting on September 1 or 2, 1983, mentioned that the dissolutions would be used as a bargaining tool with the bank. The accused likely was proceeding from a misguided sense of loyalty to these four persons, who had been friends as well as clients, but his conduct was nonetheless unethical.

On the conflict of interest finding, section 4.32 of the ABA Standards for Imposing Lawyer Sanctions recommends:

"Suspension is generally appropriate when a lawyer knows of

---

[3] The limits of DR 7-102(A)(7) are anything but clear. *See* Wolfram, Modern Legal Ethics 703-04 (1986) for a discussion of this point. He correctly states that "a lawyer with a reasonable and good faith basis for concluding that the conduct is legal may so advise a client without risk of incurring a disciplinary sanction for ultimately being proved wrong." *Id.* at 704.

a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client."

From the record we cannot determine whether the net result of the events was a plus or minus to any client, in a financial sense. The record shows that some or all of the property was forthwith sold to third persons and that litigation ensued to set aside the transfers. Mrs. Beecroft has sued the accused for malpractice.

We have no hesitancy in concluding that the conduct created the potential for injury to a client. Actions were filed against them. Mrs. Beecroft has filed a damage claim against the accused.

An aggravating factor — a serious one, also observed by the Trial Panel — was the accused's lack of candor. He was evasive in his testimony. The Panel observed, in its Order on Sanctions:

> "Of serious concern to the Panel is the Accused's failure to candidly address his role in assisting Mr. and Mrs. Beecroft and Mr. and Mrs. Neptune in their attempt to shield their assets from creditors. Accused's testimony concerning his lack of knowledge of the financial predicament of the parties and lack of participation in counseling the clients in their attempts to resolve their financial difficulties seriously strained his credibility. It also evidences a lack of appreciation of his responsibilities as a member of the legal profession."

The accused has no prior disciplinary record.

In previous conflict cases, a reprimand often has been the sanction. However, we have imposed suspension in cases involving serious aggravating circumstances. *See In re Moore,* 299 Or 496, 703 P2d 961 (1985) (one year suspension - also violated DR 5-104(A) and DR 5-101(A)); *In re O'Byrne,* 298 Or 535, 694 P2d 955 (1985) (four month suspension for violation of DR 5-101(A) and DR 5-104(A), no allegation of DR 5-105 violation); *In re Baer,* 298 Or 29, 688 P2d 1324 (1984) (60 day suspension - also violated DR 5-101(A) and DR 5-104(A)); *In re Boyer,* 295 Or 624, 669 P2d 326 (1983) (seven month suspension) - also violated DR 5-101(A); *In re Jans,* *supra* (1983) (30 day suspension for violating DR 5-105). The Trial Panel, in this case, ordered a 30-day suspension.

By itself, the violation of the conflicts rule, DR 5-105, would justify a 30-day suspension. The violations of DR 1-102(A)(4) and DR 7-102(A)(7) are not insubstantial, however, and we have concluded that a longer suspension is appropriate.

We order that the accused be suspended from the practice of law for a period of 63 days. *See* ORAP 11.03(3)(b). Costs to the Oregon State Bar.