Argued and submitted March 11, accused found not guilty August 18, 1994

# In re Complaint as to the Conduct of

## R. SCOTT TAYLOR,
*Accused.*

## (OSB 92-12; SC S40452)

878 P2d 1103

John Joseph Kolego, Eugene, argued the cause for the accused. R. Scott Taylor, St. Michaels, Maryland, filed the brief *pro se*.

Susan Roedl Cournoyer, Assistant Disciplinary Counsel, Lake Oswego, argued the cause for the Oregon State Bar. With her on the brief was F. William Honsowetz, Jr., Eugene.

PER CURIAM

## PER CURIAM

The issue in this disciplinary proceeding is whether the Oregon State Bar (Bar) established by clear and convincing evidence that the accused violated DR 1-102(A)(3) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 7-102(A)(7) (lawyer shall not assist client in conduct known to be illegal or fraudulent); and ORS 9.527(4) (authorizing discipline for willful deceit or misconduct in the legal profession), by assisting his client in selling and encumbering the client's assets to defraud the plaintiff in an impending wrongful death action. On *de novo* review[1] of a decision of a trial panel of the Disciplinary Board, we conclude that there was not clear and convincing evidence of a violation of the rules cited above. Accordingly, we find the accused not guilty of the ethical misconduct charged.

On April 15, 1991, Radonski retained the accused to defend him against potential criminal charges and civil claims arising from an automobile accident on April 12, 1991, that killed Schmidt. After an investigation, the accused determined that there was evidence that Radonski had been drinking when he caused the accident, and that he probably was criminally and civilly liable for Schmidt's death. Radonski was a chronic alcoholic who was actively drinking. After the accident, Radonski made repeated threats to kill himself to evade imprisonment for his role in the accident.

On April 17, 1991, the accused and Radonski entered into a fee agreement. It provided that the accused would receive a flat fee of $15,000 for representation if the state filed criminal charges against Radonski for his role in the accident. If the state filed no criminal charges, or if the accused performed work on any civil matter arising from the accident, the accused would bill Radonski at an hourly fee of $125. To secure the fee, Radonski gave the accused a promissory note, secured by a trust deed on Radonski's home, in the amount of $25,000. Radonski owned the home free and clear of other encumbrances.

In May 1991, the accused assisted Radonski in selling three contracts under which Radonski was collecting

---

[1] ORS 9.536(3); BR 10.6.

money. He sold two of the contracts to a mortgage banker and the third contract to a private party. He sold the contracts for their market value, which was about $123,000, and gave the proceeds to Radonski. On or about May 20, 1991, Radonski told the accused that he had traveled to Mexico, drank heavily, and lost about $12,000.[2] The accused became angry with Radonski.

The accused and Radonski met on about June 11, 1991, to discuss a plea bargain. Radonski had just returned from Reno, Nevada, and told the accused that he had lost an undisclosed amount of money while gambling. The accused learned on about August 15, 1991, from a presentence investigation report, that Radonski had gambled away $95,000 in Reno.

On June 12, 1991, Radonski pleaded guilty to charges of manslaughter in the second degree and driving under the influence of intoxicants (DUII) for his role in the accident.[3] ORS 163.125; ORS 813.010. The accused negotiated a settlement of a civil claim arising from Schmidt's death and obtained a complete release for his client.[4]

The Bar charged the accused with violating DR 1-102(A)(3), DR 7-102(A)(7), and ORS 9.527(4). DR 1-102 provides, in part:

"(A)   It is professional misconduct for a lawyer to:

"* * * * *

"(3)   Engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

DR 7-102(A)(7) provides:

"(A)   In the lawyer's representation of a client or in representing the lawyer's own interests, a lawyer shall not:

"* * * * *

"(7)   Counsel or assist the lawyer's client in conduct that the lawyer knows to be illegal or fraudulent."

---

[2] Radonski claimed at one time that he was robbed by a prostitute.

[3] The court imposed maximum consecutive sentences of 18 months on the manslaughter conviction and one year on the DUII conviction, and a $100,000 victim's restitution judgment against Radonski.

[4] The settlement was paid from the proceeds of Radonski's automobile insurance policy.

The Bar also contends that the accused violated ORS 9.527(4) by violating ORS 95.230(1)(a). ORS 9.527(4) provides:

"The Supreme Court may disbar, suspend or reprimand a member of the bar whenever, upon proper proceedings for that purpose, it appears to the court that:

"* * * * *

"(4) The member is guilty of willful deceit or misconduct in the legal profession."

ORS 95.230 provides, in part:

"(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

"(a) With actual intent to hinder, delay, or defraud any creditor of the debtor."

The trial panel concluded that two acts by the accused violated those provisions. First, the trial panel concluded that the accused assisted Radonski in converting his assets to cash, with the intention of hiding the assets in anticipation of a wrongful death action, and failed to prevent Radonski from squandering those assets. Second, the trial panel concluded that the accused caused Radonski to execute a note secured by a $25,000 trust deed on Radonski's home in the accused's favor for the sole purpose of deterring creditors from executing on the home.

We first consider the mental element necessary to establish a violation of DR 1-102(A)(3), DR 7-102(A)(7), and ORS 95.230. Assisting a client to cheat creditors is dishonest conduct under DR 1-102(A)(3). *In re Hockett*, 303 Or 150, 159, 734 P2d 877 (1987). However, the accused must act with the intent to cheat creditors to violate that rule. *Id.* at 159. DR 7-102(A)(7) forbids a lawyer from engaging in conduct that the lawyer *knows* to be illegal or fraudulent in representing a client. *In re Hockett, supra,* 303 Or at 160.[5] Further, a

---

[5] The trial panel incorrectly stated that DR 7-102(A)(7) applies to "conduct that the lawyer knew, *or should have known*, was fraudulent." (Emphasis supplied.) The emphasized phrase is not a part of the rule. In the disciplinary rules, "fraud" refers to conduct that would be actionable fraud in Oregon in the tort sense. *In re*

transfer of assets is fraudulent under ORS 95.230(1)(a) if it is made "with an actual intent to hinder, delay or defraud any creditor of the debtor."

■    We next determine whether the accused had the requisite mental state when he sold or encumbered Radonski's property. The Bar must prove a disciplinary violation by clear and convincing evidence. " 'Clear and convincing evidence means that the truth of the facts asserted is highly probable.' " *In re Johnson*, 300 Or 52, 55, 707 P2d 573 (1985); *In re Monaco*, 317 Or 366, 370 n 4, 856 P2d 311 (1993).

■    It is undisputed that the accused assisted Radonski in selling three contracts and that he delivered the proceeds to Radonski. If the accused sold the contracts and delivered the proceeds to Radonski with the intent to defraud Radonski's potential creditors, that conduct would violate DR 1-102-(A)(3), DR 7-102(A)(7), and ORS 9.527(4).

The accused testified that he sold Radonski's contracts for cash for three reasons. First, he wanted to enable Radonski to offer a structured annuity as part of a potential settlement proposal to Schmidt's estate, in addition to the available insurance coverage. The accused testified that he spoke with Radonski's insurance adjuster "about whether we could put a structured settlement together." The accused also testified that he began to draft a trust agreement for Radonski's property, but the trust agreement was never executed because Radonski "wouldn't follow through." Second, he sold the contracts so that Radonski would receive market value for them. He feared that, if a judgment creditor executed on the contracts after a civil judgment, Radonski would suffer a loss of their value. Third, he hoped to settle quickly with Schmidt's estate so that Radonski would be in a more favorable position when Radonski was sentenced in the criminal matter. The accused denied that he had any fraudulent intent in dealing with Radonski's contracts.

The Bar concedes that those asserted reasons for selling the contracts are plausible, but contends that the accused failed to take any actions that would support his contention that he sold the contracts for those valid reasons.

---

*Dinerman*, 314 Or 308, 317, 840 P2d 50 (1992). *See also Rice v. McAlister*, 268 Or 125, 128, 519 P2d 1263 (1974) (listing elements of fraud).

The Bar argues, first, that the accused's failure to communicate his idea for a structured settlement, using Radonski's money, to the insurer or to opposing counsel demonstrates that there was no plan for a structured settlement. The Bar also argues that the accused took no steps to preserve the proceeds from the sale of the contracts by depositing the funds in his trust account, setting up a separate trust account, or establishing a trust. The Bar contends that the accused increased the chance of a loss of Radonski's assets by delivering cash to his alcoholic client, who had threatened suicide, and by failing to instruct his client to preserve the funds for a structured settlement.

We turn to the evidence concerning the Bar's charges. As noted above, the accused testified that he spoke with Radonski's insurance adjuster about creating a structured settlement with Schmidt's estate. Neither party called the insurance adjuster as a witness to discuss the accused's testimony concerning that communication.

The accused did not disclose to the lawyer for Schmidt's estate the fact that Radonski had substantial liquid assets and that he desired to use his money to structure a settlement beyond his available insurance coverage. According to the accused, such a disclosure would have undermined the goal of preserving Radonski's assets to the greatest extent possible in any settlement. The Bar does not present any convincing argument or point to particular evidence that demonstrates why that explanation is unsound. Within ethical guidelines, the accused's obligation was to settle, if possible, the claim of Schmidt's estate on terms that were favorable to Radonski. In light of that objective, it would make little sense for the accused to tell the lawyer for Schmidt's estate that Radonski had a large amount of cash and that he desired to use the money to structure a settlement for a sum greater than the limits of Radonski's insurance policy.

The accused's time records show that, within a few days of his initial meeting with Radonski, the accused began to prepare a trust for him. The Bar offered no evidence to rebut the accused's testimony that Radonski refused to "follow through" with the accused's proposal for a trust to hold Radonski's cash. The Bar called Radonski as a witness, but

elicited no testimony from him to support the Bar's contention on that point. Radonski's sons may have witnessed the conversations about the trust and the accused's plan, but neither party called them as witnesses.

■ The Bar elicited testimony from Durnford to prove that the accused intended to aid his client in hiding or squandering the proceeds of the contract sales in order to defraud potential creditors. Durnford met Radonski in 1991 when she and her husband purchased a boat from him. Durnford testified that Radonski told her, "a minimum of three separate times" in April and May 1991, that the accused was "[structuring contracts] so that the funds would be put some place where they could not be found" and that "Mr. Taylor was advising him on how to transfer assets or hide assets where they couldn't be found by the injured party and their attorney." Durnford testified that Radonski had told her that the accused had sent him to Mexico to "get out of town for a while," because the accused wanted to "take care of the financial arrangements on several notes" and wanted him "out of town so he couldn't be questioned or anyone ask anything until it was done." Durnford testified that Radonski told her that, on his return from Mexico, the accused told him that "he came back too soon," and Radonski left to go to Reno. Durnford also testified that Radonski said that the accused assured him that he would not go to prison.[6]

In addition, the Bar offered the testimony given by Radonski at his homestead exemption hearing. Radonski testified:

"Q  Did you ask Miss Durnford to move into [your residence] and be caretaker?

"A  Yes, I did.

---

[6] Hearsay evidence is admissible in Bar proceedings if it satisfies the standards in OSB Rule of Procedure 5.1, which provides:

"Trial panels may admit and give effect to evidence which possesses probative value commonly accepted by reasonably prudent persons in the conduct of their affairs. Incompetent, irrelevant, immaterial, and unduly repetitious evidence should be excluded at any hearing conducted pursuant to these rules."

Cf. Reguero v. Teacher Standards and Practices, 312 Or 402, 417, 822 P2d 1171 (1991) (discussing admissibility of hearsay evidence under ORS 183.450(1) in administrative proceeding). Over objections by the accused, Durnford's hearsay testimony was admitted by the trial panel. On appeal, defendant challenges the probative value of Durnford's testimony but does not challenge its admissibility.

"Q   Why did you do that?

"A   [The accused] was worried about — well, I had had this accident. And my attorney was wanting me to kind of be out of the way because he — he wanted us to appear in court, you know, and surrender to the Court, but he didn't want to have Mr. Mortimore [the district attorney] serve papers on me, so he talked me into going to Mexico to hide out for a while until he could get, you know, the papers and stuff ready for us to come up and surrender to the Court, which I did. So I —

"[interruption]

"A   [cont'd] Yeah. I was just going to say I didn't want to leave it set idle, so I asked the Durnfords to take care of the place at that time.

"* * * * *

"Q   Okay. And then did you surrender yourself to the Court?

"A   After — after I went to Mexico I come back and I was really in drinking pretty heavy at that time, and I went into a bunch of hallucinations down there, and I just — well, I don't know what the heck happened, but I lost all the money I had when I went back down there, and so the people brought me back, and [the accused], you know, he was really infuriated because I got back too early. So then he sent me to Reno. And so I was supposed to stay in Reno. And after I come back from there I — we surrendered to the Court and I was released on the stipulation that I go to Roseburg for treatment, alcohol treatment program."

■   We first examine Durnford's testimony about what Radonski told her about the accused's effort to structure the contracts so that the proceeds of the sale could be hidden, presumably from creditors. Such conduct, if proven, would violate DR 1-102(A)(3), DR 7-102(A)(7), and ORS 9.527(4). We do not doubt that Durnford accurately testified concerning what Radonski told her.

The record establishes that the accused sold the contracts to disinterested parties at market value. The sales transactions did not purport to control the disposition of the sale proceeds, beyond entitling Radonski to the proceeds. The "structure" of the sales does not indicate that the accused's intention in selling the contracts was fraudulent. The accused testified that he delivered the proceeds to Radonski and that

Radonski declined to place the money in a trust for the accused's use in settling the potential claim of Schmidt's estate. The Bar introduced no evidence that the accused continued to exercise control over the proceeds of the sale after he gave them to Radonski or that he knew the whereabouts of the money that Radonski claims he lost or gambled away. The Bar did not demonstrate that Radonski's statement about losing the money was false or that, in reality, either the accused or Radonski placed the money in a secret location and planned to recover it at a later date. The Bar elicited no testimony from Radonski to corroborate Durnford's testimony that the accused participated in a scheme to hide the contract proceeds. Given Radonski's demonstrably impaired ability to recall and testify about the events around the critical period of time, we do not find his statement to be sufficiently reliable to support a finding in accordance with it.

■ The Bar argues that the accused's delivery of the proceeds of the contract sales to Radonski demonstrates that the accused had no plan to collect Radonski's assets in order to facilitate a settlement of potential claims against him. However, in the absence of a fraudulent intent, the delivery of the money to the client was not an unethical act, because the money belonged to Radonski. The accused was required to deliver the money to his client, in the absence of other instructions from the client. Once the money was in Radonski's possession, there was nothing that the accused could do to control what the client did with it.

The record would permit us to construe the objective facts about the accused's actions concerning the contract sales to sustain either of the parties' competing arguments. The issues are whether the accused engaged in those actions with the requisite fraudulent intent and whether the evidence establishes that intent by clear and convincing evidence.

■ The Bar's strongest evidence of a guilty intent is Durnford's testimony about what Radonski told her about the accused's involvement in his plan to help Radonski hide his money from creditors. For several reasons, we decline to credit those statements by Radonski to Durnford. At the time he spoke to Durnford in April and May 1991, Radonski was a chronic alcoholic, who recently had committed a criminal

homicide as a result of his drinking. After Radonski spoke to the accused about his legal exposure, he became distraught at the prospect of going to jail, to the point that he cried, shook, and repeatedly threatened to commit suicide. When questioned about his fee arrangement in the hearing in the present proceeding, Radonski said that "everything was such a mixed up blur at that time" because of his "really heavy" drinking. Durnford testified that, during one of her meetings with Radonski, he was drinking shots of whiskey at 8:30 a.m. She described his emotional state during April and May 1991 as "very nervous, very upset, very distressed, very scared." Before the trial panel, Radonski displayed an obvious lack of memory of important conversations and events related to this case.

At the same time that he told Durnford that the accused was structuring his contract sales to hide his assets, Radonski also told her that the accused had told him that he would not be imprisoned for his role in Schmidt's death. From the record, we conclude that, in all probability, that statement is untrue. The nature of Radonski's offense was so serious that it seems very improbable that the accused would have told his client that he would not go to jail.

Radonski made an untrue statement to Durnford about part of the accused's advice to him. His story that he lost the money conflicts with his statement to Durnford that the plan was to hide the money from creditors. At the time of his contacts with Durnford, he was experiencing great stress due to his legal predicament and the effects of his chronic alcoholism and, as a result, did not remember accurately, or at all, important details of the accused's advice. For those reasons, we are not convinced that the balance of Radonski's statements to Durnford about the accused is credible.

The Bar also argues that the accused's directives to Radonski to leave town, as testified to by Durnford and in Radonski's homestead exemption hearing testimony, show that the accused had a fraudulent intent to hide Radonski's assets. That evidence does not aid the Bar. The Bar charged the accused with participating in a fraudulent scheme to hide Radonski's assets. The evidence on which the Bar relies does not refer to Radonski's assets or support an inference that the accused intended to hide Radonski's assets from his creditors.

On this record, we conclude that the Bar has not proven that it is highly probable that the accused had the requisite fraudulent intent when he sold Radonski's contracts and gave him the proceeds. The Bar has not established its charge concerning the accused's role in the disposition of the client's contracts by clear and convincing evidence.

We next examine the charge surrounding the trust deed on Radonski's home. As discussed above, Radonski gave the accused a promissory note in the sum of $25,000, secured by a trust deed on Radonski's home. The accused asserted that the purpose of the transaction was to ensure payment of the accused's attorney fees. The Bar alleged that the accused knew that Radonski participated in that transaction with the intention of encumbering his assets to defraud creditors. If the accused participated in the trust deed transaction for the purpose of assisting Radonski to defraud his creditors, that conduct would violate DR 1-102(A)(3), DR 7-102(A)(7), and ORS 9.527(4).

We turn to the evidence regarding that charge. The accused said that the note and trust deed were security for the payment of fees and expenses for the criminal and civil cases. The accused explained that the $15,000 retainer that he received in several payments for representation on the criminal case could be applied to the anticipated fee for the civil case only in the unlikely event that the state filed no criminal charge. The accused says that he properly credited Radonski when he paid fees and reduced the note over time to the sum of approximately $6,000. The accused also testified that he eventually discounted and sold the note for $4,500 on about November 10, 1992, because he needed money to move to Maryland. He denies that he made any arrangement with Radonski to create or dispose of the note as part of a plan by Radonski to cheat his creditors.

The Bar elicited testimony from Durnford, who testified that, in approximately May or June 1991, she discussed with Radonski the prospect of purchasing Radonski's home. According to Durnford, Radonski said that the title to the house was encumbered by a trust deed to secure a note to the accused, but that the purpose of the note was to deter any creditor from executing on the property. According to

Durnford, Radonski said that the accused's note and Radonski's homestead exemption equalled most of the home's value. Durnford testified that Radonski stated to her that, after his legal difficulties were over, the accused would cancel the note, and then Radonski could sell the house to Durnford. Again, we assume that Durnford accurately testified as to what Radonski told her.

DR 5-103(A)(1) provides:

"(A) A lawyer shall not acquire a proprietary interest in the cause of action or the subject matter of litigation the lawyer is conducting for a client, except that the lawyer may:

"(1) Acquire a lien to secure payment of fees or expenses due or to become due."

That rule permitted the accused to acquire a lien against Radonski's property to secure payment for actual or anticipated fees or expenses. The rule authorizes the accused's conduct here, unless the accused acquired the lien with the intention of assisting Radonski to defraud his creditors.

The evidence is unclear regarding the value of Radonski's home in April 1991, when the note and trust deed were signed. The assessed value, according to the Coos County tax assessor, was $47,000. Other evidence indicates that the property had a fair market value of between $55,000 and $65,000. Durnford testified that she was an experienced realtor, that she was familiar with the value of property in the same area, that she agreed in May 1991 to pay Radonski $60,000 for the property whenever he was able to sell it, and that it was a "good buy" at that price. The Bar contends that the accused's lien and Radonski's homestead exemption totaled $40,000. The record does not establish the value of the property that was subject to execution in April 1991, in excess of the accused's lien and Radonski's homestead exemption. None of the estimates of property value in the record is sufficiently close to the $40,000 total encumbrance to permit us to infer that the accused's lien rendered the property an unattractive asset to a potential judgment creditor.

The accused claimed that, during his relationship with Radonski, he administered the note and trust deed in a *bona fide* manner by reducing the amount of the debt when Radonski made payments on his bill. Even if we were to

entirely disbelieve the accused's testimony, that disbelief would not be evidence to establish any contrary proposition. The Bar did not introduce evidence to show that the accused created or manipulated the note and trust deed transaction in a way that demonstrated a fraudulent intent. The accused did not destroy the note when Radonski's legal cases were over, as Radonski had represented to Durnford. He held it for approximately 14 months after he finished representing Radonski. He then sold the note for a market price and canceled the balance of Radonski's bill. That evidence indicates that the sale was an arm's-length transaction for fair value. The $25,000 lien was approximately $4,000 greater than the total fees and costs that the accused's firm charged for legal work on Radonski's cases. We cannot infer from that difference that the lien was created to defraud Radonski's creditors.

We have examined the objective facts regarding the note and trust deed and conclude that the evidence does not show that it is highly probable that the accused participated in that transaction with the intention of helping Radonski defraud his creditors. The accused's explanation is consistent with the evidence in the record regarding the creation and ultimate sale of the security. Because of our concerns regarding Radonski's reliability, as noted above, we are not convinced that his statements to Durnford, that the accused took the note and trust deed to help him defraud creditors, are credible. The Bar has not established its charge regarding the lien by clear and convincing evidence.

The Bar has not carried the required burden of proof on its charges against the accused. Accordingly, we find the accused not guilty of ethical misconduct. Pursuant to ORS 9.536(4), we award the accused his actual and necessary costs and disbursements incurred.

Accused found not guilty.